IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| CVS PHARMACY, INC.,<br><br>                Plaintiff,<br><br>    v.<br><br>BAUSCH HEALTH COMPANIES, INC.,<br>SALIX PHARMACEUTICALS, LTD.,<br>SALIX PHARMACEUTICALS, INC.,<br>TEVA PHARMACEUTICAL INDUSTRIES<br>LTD., and TEVA PHARMACEUTICALS USA,<br>INC.,<br><br>                Defendants. | Case No.<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiff CVS Pharmacy, Inc. ("CVS" or Plaintiff") sues Defendants Bausch Health Companies, Inc., Salix Pharmaceuticals, Ltd., Salix Pharmaceuticals, Inc. (collectively "Bausch"), Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA, Inc. (collectively "Teva") (together, "Defendants"), under the antitrust laws of the United States and for their Complaint allege as follows:

## I.     INTRODUCTION

1.     Defendant Bausch markets Xifaxan 550 mg, containing the active pharmaceutical ingredient rifaximin. Xifaxan 550 mg is the only rifaximin product available on the market to treat Irritable Bowel Syndrome with Diarrhea ("IBS-D"). IBS-D causes patients to suffer repeated episodes of prolonged diarrhea, reducing their quality of life, affecting their daily work, and increasing their financial burdens. Up to 15% of Americans suffer from the condition, and millions of them depend on rifaximin for relief, taking it periodically for years and sometimes for the rest of their lives.

2.     Generic competition would reduce the price of a 14-day supply of rifaximin to less than $200. Instead, Bausch currently charges more than $2,000 for a 14-day supply of Xifaxan. As of 2024, Bausch's annual sales of Xifaxan in the United States were approximately $1.99 billion. While Bausch also sells a 200 mg strength of Xifaxan, virtually all of its sales are of the 550 mg strength.

3.     This Complaint explains how Defendants' violation of federal antitrust law allowed Bausch to charge more than ten times the competitive generic price of Xifaxan 550 mg, extracting billions of dollars from Xifaxan purchasers market wide.

4.     Rifaximin is a broad-spectrum antibiotic that has been used across the globe since 1987 for treating various gastrointestinal ailments. The compound was patented in 1982 and first sold in Italy beginning in 1987.

5.    Bausch ultimately obtained a series of secondary patents on the use of rifaximin to treat IBS-D.  But those patents were very weak and could not prevent competition from generic versions of the drug.  In fact, as explained in detail below, the federal courts have invalidated the key patents that Bausch claimed protected Xifaxan from generic competition for the IBS-D indication.

6.    The effects of generic competition for a brand drug are predictable: sales switch quickly from the brand drug to the generic version.  Generic drugs are priced well below the brand drug price, with prices for the generics falling farther as more generic manufacturers enter the market.  Within six months to a year of entering the market, generics capture about 90% of the brand's unit sales.  The rate of generic substitution is not materially affected by the number of entrants, but the generic price decreases as the number of entrants increases.

7.    Brand manufacturers' profits fall dramatically when generic competition begins. Unscrupulous brand manufacturers sometimes try to avoid that fate by unlawfully preventing or delaying generic entry.  Bausch did that here.

8.    When Defendant Teva's predecessor corporation developed a generic version of Xifaxan, Bausch sued it for patent infringement.  In September 2018, before the court ruled on the merits of Bausch's claims, Bausch and Teva settled the patent lawsuit.

9.    In the settlement, Bausch made a "reverse payment" to Teva to induce it to delay entering the market with 550 mg generic Xifaxan.  That is, Bausch, the plaintiff in the patent lawsuit, paid Teva, the defendant in the patent lawsuit.  In exchange for the payment, Teva agreed to stay out of the market for more than nine years, from September 2018 until January 2028.  This reverse payment violated the antitrust laws.

10.     One of the payments from Bausch to Teva took the form of an agreement that, if Teva agreed not to compete with Bausch until January 2028, Bausch would not compete with Teva by selling a competitive generic when Teva finally entered the market.  A brand's generic version of its own branded product is known as an authorized generic ("AG").  Teva's agreement to delay its generic entry was extremely valuable to Bausch, and Bausch's agreement not to compete with Teva by launching an AG was extremely valuable to Teva.

11.     As shown below, Bausch's unlawful no-AG payment was likely worth more than $300 million to Teva.  That was far more than Teva could have made by winning the patent case and competing fairly, and lawfully, against Bausch.

12.     Bausch and Teva also used a series of additional anticompetitive tactics to deter other generic manufacturers from beating Teva to market before January 2028.

13.     The weakness of Bausch's patents created the risk that other generic manufacturers could avoid or defeat them and market generic Xifaxan 550 mg before Teva enters the market in January 2028.  To reduce that possibility, Bausch and Teva included in their agreement three provisions aimed at deterring other generic competitors.  They agreed that, if another generic manufacturer enters the market before January 2028 – by prevailing against Bausch in patent litigation, getting a license from Bausch, or using a special statutory provision that Congress created – Teva can also enter on that earlier date.  These provisions eliminated the possibility that a subsequent filer could enter the market before Teva as the sole generic product for some significant period of time.

14.     These deterrence clauses reduced other generic manufacturers' incentive to challenge Bausch's patents.  The deterrence clauses in fact worked against several generic

manufacturers, which agreed to drop their patent challenges and stay out of the market until the delayed January 2028 date that Bausch paid Teva to accept.

15.     Another generic manufacturer was not deterred.  It litigated Bausch's principal patents to conclusion, and it won.  A federal court held that Bausch's IBS-D patents were invalid, and a court of appeals upheld that decision.  But that manufacturer made a technical legal mistake: it failed to file a so-called "section viii statement" to "carve out" certain non-IBS-D uses of Xifaxan from its application to the FDA, which it easily could have done.  As a result, that manufacturer is precluded from entering the market until the non-IBS-D patents expire in 2029, even though the IBS-D patents have been found invalid.

16.     Despite the invalidation of Bausch's principal IBS-D patents, generic entry has still not occurred and will likely not occur until Teva enters the market in January 2028.  Teva has 180-day regulatory exclusivity that effectively blocks subsequent filers from entering the market until the expiration of Teva's 180-day exclusivity.  In addition, as explained more fully below, Bausch has obtained additional patents and listed them in FDA's Orange Book.  As a result, generic manufacturers that recently filed applications with the FDA seeking to market generic Xifaxan 550 mg had to certify that these additional patents are invalid or not infringed, and Bausch is entitled to a 30-month stay of approval of their generic applications.  Bausch listed those patents even though many of them were not properly listed under the Hatch-Waxman statute and controlling regulations.  The later-filing generics are now blocked from entering the market both because of the 30-month stay and because of Teva's 180-day exclusivity.

17.     Neither obstacle would exist but for Bausch's unlawful payments to Teva to delay entry.  But for those payments, Teva would be on the market and its exclusivity would have by now expired.  Had Teva launched its generic, Xifaxan would have already lost nearly all of its

sales to generic Xifaxan and Bausch would have had no reason to risk antitrust liability by listing unlistable patents merely to get the benefit of the statutory 30-month stay.

18.    As discussed in further detail below, to obtain FDA approval, a generic applicant must certify that its generic drug will not infringe any patents listed in the Orange Book. One such certification, known as a Paragraph IV certification, states that the listed patents are invalid or will not be infringed by the generic applicant's product. When a generic manufacturer makes a Paragraph IV certification, a brand manufacturer can delay FDA approval of the generic by suing the generic applicant for patent infringement. Such a suit results in an automatic 30-month stay of FDA approval of the generic product.

19.    After settling with Teva, Bausch continued to delay generic entry by improperly listing ineligible patents in the Orange Book and filing baseless litigation against subsequent generic applicants for purportedly infringing those ineligible patents. Filing and suing on these additional ineligible patents served no purpose other than to delay competition by subjecting subsequent generic filers to Hatch-Waxman's automatic 30-month stay of approval and by requiring generics to file otherwise unnecessary Paragraph IV certifications against these bogus patents.

20.    Bausch's improper Orange Book listings deprived several subsequent generic applicants of an opportunity to use the section viii carve-out pathway to approval notwithstanding Teva's 180-day exclusivity.

21.    Amneal Pharmaceuticals of New York, LLC ("Amneal") was one such generic applicant. In February 2024, Amneal filed an application with the FDA seeking approval to market a generic version of Xifaxan.

22.     Absent Bausch's improper Orange Book listings, Amneal would have filed an application without any Paragraph IV certifications.  Instead, it would have included section viii carve outs as to certain indications, along with non-Paragraph IV certifications (not subject to 30-month stays) as to the remaining Orange-Book listed patents, and the FDA would have approved the application by now.  Amneal has already received tentative FDA approval, which indicates that the FDA is withholding final approval only because of a 30-month stay and/or Teva's 180-day exclusivity.

23.     Unfortunately for Plaintiffs and other purchasers, as a result of Bausch's improper Orange Book listings, Amneal was required to file Paragraph IV certifications against several of Bausch's unexpired patents.  Although Amneal properly filed section viii carve-outs with respect to certain indications, the FDA has determined that such mixed certifications are not eligible for immediate approval because when a subsequent filer's application contains a Paragraph IV certification that filer must wait in line behind the first filer's 180-day exclusivity.

24.     Had Bausch not improperly listed unexpired patents claiming certain polymorphs of the active ingredient in Xifaxan and the treatment of IBS-D, Amneal would have been able to address Bausch's properly listed patents using only section viii carve outs and non-Paragraph IV certifications.  As a result, Amneal would not have been subject either to a 30-month stay or to Teva's 180-day exclusivity period.

25.     Bausch sued several other generic manufacturers that made Paragraph IV certifications with respect to its listed Xifaxan patents and are now bottlenecked behind Teva's 180-day exclusivity and the Hatch-Waxman 30-month stay.  These generics include Carnegie Pharmaceuticals LLC and Carnegie Pharma Limited ("Carnegie"), Saba Ilac Sanayi ve Ticaret A.S. ("Saba"), Alkem Laboratories Ltd. ("Alkem"), Zydus Pharmaceuticals (USA) Inc. and

Zydus Lifesciences Limited (collectively "Zydus"), Cipla USA, Inc. and Cipla Limited (collectively "Cipla"), and potentially others.

26.     Since the Teva litigation had already concluded, the only purpose of listing these Patents was to bottleneck subsequent filers by requiring them to file Paragraph IV certifications.

27.     Had Bausch not made the large and unjustified reverse payment to induce Teva to settle the litigation, Teva would have invalidated Bausch's patents and either launched itself or cleared a path for others to do so.  In any case, a generic would have been on the market earlier in time.

28.     Had Amneal and others had the opportunity to file an application containing section viii carve outs and non-Paragraph IV certifications, one or more of them would have launched by now.

29.     Because the entry of each incremental generic competitor reduces the generic market price, the price of rifaximin would have already plummeted.

30.     However, as a result of Bausch and Teva's unlawful conduct, generic Xifaxan 550 mg still has not entered the market seven years after the unlawful agreement with Teva and three years after a federal court declared critical Bausch patents invalid.  Plaintiff and other purchasers of the drug continue to pay monopoly prices rather than competitive prices for rifaximin and will likely do so until significantly after January 2028.

## II.     PARTIES

31.     Plaintiff CVS Pharmacy, Inc. is a Rhode Island corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895.  CVS purchases substantial quantities of pharmaceutical products and other goods for resale to the public through more than 9,000 drugstores, approximately eleven mail service pharmacies, and twenty-seven specialty pharmacies owned and operated by its affiliates.  CVS brings this Action on its own

behalf and as the assignee of McKesson Corporation and Cardinal Health, Inc., which during the relevant period each purchased Xifaxan directly from Bausch for resale to CVS and has subsequently expressly assigned its claims arising out of those purchases to CVS.

32.    Defendant Salix Pharmaceuticals, Ltd. is a corporation organized under the laws of Delaware with its principal place of business in Bridgewater, New Jersey.

33.    Defendant Salix Pharmaceuticals, Inc. is a corporation organized under the laws of California with its principal place of business in Bridgewater, New Jersey.  Salix Pharmaceuticals, Inc. is a wholly owned subsidiary of Salix Pharmaceuticals, Ltd. Salix Pharmaceuticals, Inc. and Salix Pharmaceuticals, Ltd. are collectively referred to as "Salix."

34.    On April 1, 2015, Valeant Pharmaceuticals International, Inc. ("Valeant") acquired Salix Pharmaceuticals, Ltd. and, on or about that date, assumed its rights and obligations under the patents that were at issue in patent litigation between Salix and Teva Pharmaceutical Industries Ltd.  Effective July 13, 2018, Valeant changed its corporate name to Bausch Health Companies Inc.  Salix Pharmaceuticals, Ltd. is now a wholly owned subsidiary of Bausch Health Companies Inc. and Salix Pharmaceuticals, Inc. is an indirect wholly owned subsidiary of Bausch Health Companies, Inc.

35.    Defendant Bausch Health Companies Inc. is a corporation organized and existing under the laws of British Columbia, Canada with its U.S. headquarters in Bridgewater, New Jersey.

36.    "Bausch" is used below to refer to Valeant, n/k/a Bausch Health Companies Inc., Salix Pharmaceuticals, Ltd., and/or Salix Pharmaceuticals, Inc., including before the acquisition of the Salix entities by Valeant.

37.    Defendant Teva Pharmaceutical Industries Ltd. is a corporation incorporated under the laws of Israel, with its principal place of business in Tel Aviv, Israel.

38.    Defendant Teva Pharmaceuticals USA, Inc. is a Delaware corporation having its principal place of business in Parsippany, New Jersey.  Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. are collectively referred to as "Teva."

39.    All of Defendants' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful restraints of trade and monopolization alleged by Plaintiff, and were authorized, ordered, and/or undertaken by various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of Defendants.

### III.    JURISDICTION, VENUE, AND INTERSTATE COMMERCE

40.    This action arises under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15(a) and 26, and seeks to recover threefold damages, permanent injunctive relief, the costs of suit and reasonable attorneys' fees for the injuries sustained by Plaintiff resulting from Defendants' conspiracy to restrain trade in, and Bausch's monopolization of, the relevant market.  The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

41.    Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) because, during the relevant period, Defendants were found and transacted business in this District and a substantial portion of the events and omissions underlying this action occurred in this District.

42.    The drugs at issue in this case are sold in interstate commerce, and Defendants' conduct has occurred in, and has had a substantial effect on, interstate commerce.

## IV.    REGULATORY BACKGROUND

### A.    Characteristics of the Prescription Pharmaceutical Marketplace.

43.    The marketplace for the sale of prescription pharmaceutical products in the United States suffers from a significant imperfection that brand manufacturers can exploit to obtain and maintain market power in the sale of particular pharmaceutical compositions. Markets function best when the person responsible for paying for a product is also the person who chooses which product to purchase.  When the same person both chooses the product and is obligated to pay for it, the price of the product plays an appropriate role in the person's choice of product and, consequently, manufacturers have appropriate incentives to lower the prices of their products.

44.    The pharmaceutical marketplace, however, is characterized by a "disconnect" between the payment obligation and the product selection.  State laws prohibit pharmacists from dispensing many pharmaceutical products, including Xifaxan, without a prescription written by a doctor.  The prescription requirement introduces a disconnect between the payment obligation and the product selection.  The patient (and in most cases his or her insurer) is obligated to pay for the pharmaceutical product, but the patient's doctor chooses it.

45.    Brand pharmaceutical sellers exploit this price disconnect by employing large forces of sales representatives to visit doctors' offices and persuade them to prescribe the manufacturer's products.  These sales representatives do not advise doctors of the cost of branded products.  Moreover, studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are insensitive to price differences because they do not have to pay for the products.  The result is a marketplace in which price plays a comparatively unimportant role in product selection.

46.    The relative unimportance of price in the pharmaceutical marketplace reduces

what economists call the price elasticity of demand – the extent to which unit sales go down

when price goes up.  This reduced-price elasticity in turn gives brand manufacturers the ability to

raise price substantially above marginal cost without losing so many sales as to make the price

increase unprofitable.  The ability to raise price substantially above marginal cost profitably is

what economists and antitrust courts refer to as market power.  The result of the market

imperfections and marketing practices described above is to allow brand manufacturers to gain

and maintain market power with respect to many branded prescription pharmaceuticals,

including Xifaxan.

**B.    The Regulatory Structure for Approval of Generic Drugs and the
Substitution of Generic Drugs for Brand Name Drugs.**

47.    Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers

seeking to sell a new drug must obtain FDA approval by filing a New Drug Application

("NDA").  21 U.S.C. §§ 301-392.  An NDA must include specific data concerning the safety and

effectiveness of the drug, as well as any information on applicable patents.  21 U.S.C. § 355(a),

(b).

48.    When the FDA approves a brand manufacturer's NDA, the drug product is listed

in an FDA publication entitled Approved Drug Products with Therapeutic Equivalence

Evaluations, commonly known as the "Orange Book."  The manufacturer must list in the Orange

Book any patents that the manufacturer believes could reasonably be asserted against a generic

manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration

of the listed patents.  The manufacturer must list in the Orange Book any such patents that issue

after the FDA approves the NDA within thirty days of issuance.  21 U.S.C. §§ 355(b)(1) &

(c)(2).

49.     The FDA relies completely on the brand manufacturer's truthfulness in submitting patents to be listed, as it does not have the resources or authority to verify the validity or relevance of the manufacturer's patents.  In listing patents in the Orange Book, the FDA merely performs a ministerial act.

### C.     The Hatch-Waxman Amendments.

50.     The Hatch-Waxman Amendments, enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs.  *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98- 417, 98 Stat. 1585 (1984).  A manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application ("ANDA").  An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA and must only show that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and is absorbed at the same rate and to the same extent as the brand drug.  That is, the generic manufacturer must show that the generic drug is pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug.  The FDA assigns an "AB" rating to a generic drug in capsule or tablet form that is therapeutically equivalent to its brand-name counterpart.

51.     The FDCA and Hatch-Waxman Amendments operate on the presumption that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity, and identity, are therapeutically equivalent and may be substituted for one another.  Bioequivalence demonstrates that the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as the branded counterpart.  21 U.S.C. § 355(j)(8)(B).

52.     Congress had two goals in enacting the Hatch-Waxman Amendments.  First, it sought to expedite the entry of legitimate (non-infringing) generic competitors, thereby reducing healthcare expenses nationwide.  Second, it sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

53.     To incentivize the development of new drugs, the Hatch-Waxman Amendments created a 5-year period of new chemical entity ("NCE") exclusivity.  Following the approval of an NDA for a drug that has not been approved in any other application, no ANDA may be submitted for that drug for 5 years (or 4 years if the ANDA contains a Paragraph IV certification, as discussed in the next section).

54.     The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches and ushering in an era of historic high profit margins for brand manufacturers.  In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did.  In 1984, prescription drug revenue for branded and generic drugs totaled $21.6 billion; by 2009, total prescription drug revenue had soared to $300 billion.

**D.      Paragraph IV Certifications.**

55.     To obtain FDA approval of an ANDA, a manufacturer must certify that the generic drug will not infringe any patents listed in the Orange Book.  Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four certifications:

      i. that no patent for the brand drug has been filed with the FDA (a "Paragraph I certification");

      ii. that the patent for the brand drug has expired (a "Paragraph II certification");

      iii. that the patent for the brand drug will expire on a particular date and the manufacturer does not seek to market its generic product before that date (a "Paragraph III certification"); or

iv. that the patent for the brand drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").

56.     If a generic manufacturer files a Paragraph IV certification, a brand manufacturer can delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement.  If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the Paragraph IV certification ("Paragraph IV Litigation"), the FDA will not grant final approval to the ANDA until the earlier of (a) the passage of 30 months or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA.  Until one of those conditions occurs, the FDA cannot authorize the generic manufacturer to market its product by granting final approval.  However, the FDA may grant an ANDA tentative approval when it determines that the ANDA would otherwise be ready for final approval but for the 30-month stay or the expiration of a first filer's exclusivity.

57.     As an incentive to spur manufacturers to seek approval of generic alternatives to branded drugs, the first generic manufacturer to file an ANDA containing a Paragraph IV certification typically gets a period of protection from competition from other ANDA filers seeking approval to market generic versions of the same drug.  For Paragraph IV certifications made after December 2003, the first generic applicant receives 180 days of market exclusivity vis-à-vis other ANDA filers (unless some forfeiture event, as discussed below, occurs).  Generics are usually at least 15% less expensive than their brand name counterparts when there is a single generic competitor, but this discount typically increases to 50% to 80% (or more) when there are multiple generic competitors on the market.  Being able to sell at the higher single generic price for six months or more may be worth hundreds of millions of dollars to a generic manufacturer.

58.    Brand manufacturers can "game the system" by listing patents in the Orange Book (even if such patents are not eligible for listing) and suing any generic competitor that files an ANDA with a Paragraph IV certification (even if the competitor's product does not actually infringe the listed patents) in order to delay final FDA approval of an ANDA for up to 30 months.  Listing patents in the Orange Book allows brand manufacturers to block generic entry before it occurs rather than waiting until the generic receives FDA approval and launches and then asserting its patents at that time.  That brand manufacturers often sue generics simply to delay generic competition – as opposed to enforcing a valid patent that is actually infringed by the generic – is demonstrated by the fact that generic manufacturers prevail 73% of the time when they challenge listed patents.

59.    On December 8, 2003, Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") in order to make it more difficult for brand and generic manufacturers to conspire to delay the start of the first filer's 180-day period of generic market exclusivity.  The MMA outlines a number of conditions under which an ANDA applicant forfeits its eligibility for 180-day exclusivity making way for other ANDA filers to launch their generic products.  For example, forfeiture occurs if the first ANDA applicant fails to obtain tentative approval from the FDA within 30 months of filing a substantially complete ANDA, unless the failure is caused by FDA changing or reviewing the approval requirements after the filing of the initial application.  Forfeiture under the MMA most commonly occurs for failure to obtain tentative approval within the requisite 30 months.

60.    Under the "failure to market" provision, a first ANDA applicant may alternatively forfeit 180-day exclusivity if it fails to market its generic drug by the later of: (a) the earlier of the date that is (i) 75 days after receipt of final FDA approval or (ii) 30 months after the date it

submitted its ANDA; or (b) the date that is 75 days after the date as of which, as to each of the

patents that qualified the first applicant for exclusivity *(i.e.*, as to each patent for which the first

applicant submitted a Paragraph IV certification), at least one of the following has occurred: (i) a

final decision of invalidity or non-infringement in favor of the first applicant or a subsequent

applicant with tentative approval; (ii) a settlement order entering final judgment that includes a

finding that the patent is invalid or not infringed; or (iii) the delisting of the patent from the

Orange Book by the NDA holder.

### E.    The Benefits of Generic Drugs.

61.    Generic versions of a brand name drug contain the same active ingredient and are

determined by the FDA to be just as safe and effective as their brand name counterparts.  The

only material difference between generic and brand name drugs is their price.  The launch of a

generic drug usually brings huge cost savings for all drug purchasers.  The Federal Trade

Commission estimates that about one year after market entry, the generic version typically takes

over 90% of the brand's unit sales and sells for as little as 15% of the price of the brand name

product.  As a result, competition from generic drugs is viewed by brand name drug companies

such as Bausch as a grave threat to their bottom lines.

62.    Due to the price differentials between brand and generic drugs, and other

institutional features of the pharmaceutical industry, pharmacists presented with a prescription

for a brand-name drug with an AB-rated generic equivalent will generally dispense the generic.

Since passage of the Hatch-Waxman Amendments, every state has adopted substitution laws that

either require or permit pharmacies to substitute generic equivalents for branded prescriptions

(unless the prescribing physician has specifically ordered otherwise by writing "dispense as

written" or similar language on the prescription).

17

63.     All participants in the pharmaceutical industry other than the brand manufacturer benefit from generic entry.  Pharmaceutical wholesalers and retailers pay lower prices to acquire generic drugs than to acquire the corresponding brand-name drug.  Health insurers and patients also benefit from the lower prices that result from generic competition.

64.     Generic competition enables Plaintiff (and its assignors) to purchase generic versions of the drug at prices substantially lower than brand prices.

65.     Until a generic version of the brand drug enters the market, however, there is no bioequivalent generic drug to substitute for and compete with the brand drug.  Therefore, a brand manufacturer can continue to profitably charge supracompetitive brand prices without losing substantial sales.  As a result, brand manufacturers, who are well aware of the effects of generics on their brand sales, have a strong incentive to delay generic competition, including through tactics such as those alleged here.

**F.     Authorized Generics.**

66.     The 180-day marketing exclusivity to which first-filing generics may be entitled vis-à-vis other ANDA filers does not prevent a brand manufacturer from marketing its own generic alternative to its brand drug during the 180-day exclusivity period under its own approved New Drug Application or NDA.  Such a generic is called an "authorized generic."  An authorized generic is identical to the brand drug, but is sold as a generic product, typically through a subsidiary of the brand manufacturer or through a third-party generic manufacturer.  By selling an authorized generic during the 180-day exclusivity period, the brand manufacturer is able to capture some portion of the generic sales that would otherwise be lost to the ANDA filer.  This additional competition substantially reduces drug prices for consumers.  It is typical to see such competition unless the brand and the generic have colluded to avoid it.

67.     In its study, AUTHORIZED GENERIC DRUGS: SHORT-TERM EFFECTS AND LONG-TERM IMPACT (August 2011), the Federal Trade Commission found that authorized generics capture a significant portion of sales and reduce the first filer generic's revenues by approximately 50% on average during the 180-day exclusivity period.  The first-filing generic makes significantly less money when it faces competition from an authorized generic because (1) the authorized generic takes unit sales away from the first filer; and (2) the presence of an additional generic in the market causes prices to decrease.

68.     Although first-filing generic manufacturers make significantly less money when they must compete with an authorized generic during the first 180 days, drug purchasers such as Plaintiff benefit from the lower prices caused by competition between the authorized generic and the first-filing generic.

69.     As a practical matter, authorized generics are the only means by which brand-name manufacturers engage in price competition with manufacturers of AB-rated generic drugs.  Brand-name manufacturers generally do not reduce the list price of their branded drugs in response to the entry of AB-rated generics.  Instead, they either raise the brand price to extract higher prices from the small number of "brand-loyal" patients or, more typically, they continue to raise the price of the branded drugs at the same intervals and the same rate at which they raised the price of the drugs prior to generic entry.

70.     Given the significant negative impact of an authorized generic on an ANDA filer's revenues, and the absence of any other form of price competition from the brand manufacturer, a brand manufacturer's agreement not to launch an authorized generic (a "no-AG agreement") has tremendous economic value to a generic manufacturer.  Brand manufacturers have used such agreements as a way to pay ANDA filers to delay their generic launches.  Such

19

agreements deprive drug purchasers of the lower prices resulting from generic competition in two ways. During the initial period of delay agreed to by the ANDA filer, they effectively eliminate all competition from AB-rated generic products and allow the brand manufacturer to preserve its monopoly. And, during the period in which the branded company has agreed not to sell an authorized generic, they eliminate competition between the ANDA filer's generic and the authorized generic, giving the ANDA filer a monopoly on generic sales.

71.     As a means of compensating generic manufacturers for delaying entry, brand manufacturers prefer no-AG agreements to cash payments because, in the case of no-AG agreements, a portion of the compensation is paid by purchasers of the drug in the form of higher generic drug prices. The generic manufacturer receives not only the profits that the brand manufacturer would have made by launching an authorized generic in competition with the ANDA filer's product, but also the higher prices that result from the absence of that competition. Thus, the payment to the generic manufacturer is shared between the brand manufacturer and the generic manufacturer's customers. *See King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388, 405 (3d Cir. 2015) ("The no-AG agreement transfers the profits the patentee would have made from its authorized generic to the settling generic – plus potentially more, in the form of higher prices, because there will now be a generic monopoly instead of a generic duopoly").

72.     Historically, no-AG agreements between brand and generic manufacturers took the form of an explicit promise written into a settlement agreement. However, as more courts have recognized no-AG promises as a form of unlawful payment for delay that could violate the antitrust laws, brand and generic manufacturers have moved to a different model.

73.     To conceal the no-AG promise, brand and generic manufacturers now often enter settlements containing either a volume-limited generic license or a profit-share provision (sometimes called a royalty) pertaining to generic sales.  Rather than an express promise not to launch an authorized generic, the economics of a settlement containing volume limits or profit share provisions make it unprofitable for the brand company to do so.  While the brand company entering into such an agreement may retain a theoretical right to launch an authorized generic, both parties to the agreement understand at the time they agree to it that no rational brand company would launch an authorized generic given the agreement's financial incentives.  These provisions ensure that there will be only one generic product on the market during the first six months rather than two and share the resulting monopoly profits, both by inducing the generic to accept a later entry date and, in some cases, by also requiring the generic to return a portion of its profits to the brand company in the form of a royalty.

74.     No-AG agreements need not be explicit to achieve their anticompetitive ends. Any agreement that alters the economic incentives of branded companies and ANDA filers in such a way as to give the ANDA filer a temporary monopoly over generic sales is effectively a no-AG agreement and will typically result in (i) a delay in generic entry and (ii) higher generic prices than would exist absent the agreement.  Since generic drugs are typically priced at a discount off the prevailing brand price at the time of generic entry, and since brand prices increase over time, a delay of generic entry for any reason will generally result in higher generic prices because the generic price will be set based on a higher brand price.  If the agreement between the brand and the generic includes a restraint on post-entry generic competition, such as a no-AG agreement or a volume limitation (or both), that restraint will compound the price effect and bring about even higher generic prices.

### G.    The Limits of Pharmaceutical Patent Protection

75.    The existence of one or more patents purporting to claim a drug substance or drug product does not by itself give a brand drug company an enforceable monopoly.  Patents are routinely invalidated or held unenforceable, either upon reexamination or inter partes proceedings by the U.S. Patent and Trademark Office ("PTO"), by court decision, or by jury verdict.

76.    Under the framework established by the Hatch-Waxman Amendments, a generic drug company can challenge patents ostensibly covering the branded drug.  A patent infringement lawsuit filed by the patent holder within 45 days of notification of the generic drug company's challenge of the patents will trigger a 30-month stay of regulatory approval, during which the FDA cannot approve the generic drug.

77.    At all times, a patent holder bears the burden of proving infringement.

78.    One way that a generic can prevail in patent infringement litigation is to show that the patent holder cannot meet its burden to prove infringement.  Another is to show that the patent is invalid or unenforceable.

79.    A patent is invalid or unenforceable when, *e.g.*, (i) the disclosed invention is anticipated or obvious in light of earlier prior art; (ii) an inventor, an inventor's attorney, or another person involved with the application, with intent to mislead or deceive the PTO, fails to disclose material information known to that person to be material, or submits materially false information to the PTO during prosecution; and/or (iii) a later-acquired patent is not patentably distinct from the invention claimed in an earlier patent (and no exception, such as the safe harbor, applies).

80.    As a statistical matter, if the parties litigate a pharmaceutical patent infringement suit to a decision on the merits, it is more likely that a challenged patent will be found invalid or

not infringed than upheld.  The Federal Trade Commission ("FTC") reports that generics prevailed in 73% of Hatch-Waxman patent litigation cases resolved on the merits between 1992 and 2002.  An empirical study of all substantive decisions rendered in every patent case filed in 2008 and 2009 similarly reports that when a generic challenger stays the course until a decision on the merits, the generic wins 74% of the time.

81.    If a brand manufacturer sues a generic manufacturer that filed an ANDA with a Paragraph IV certification, the FDA will not approve the ANDA until the 30-month stay expires or the court enters a judgment that the brand's patent is invalid or not infringed.  If the 30-month stay expires before the conclusion of the patent litigation, the generic may launch once it is approved, but its launch is "at risk" because the generic is at risk of having to pay damages to the brand if it is later found to infringe the brand's patent.

## H.    Deterrents to Subsequent Filers

82.    A brand manufacturer can also pay off the generic manufacturer with contractual provisions designed to deter subsequent generic manufacturers (*i.e.*, second, third, and subsequent filers) from entering the market before the delayed entry date to which the first filer has agreed.  These deterrence clauses come in at least three varieties: (a) acceleration clauses triggered by litigation success; (b) most-favored entry license provisions; and (c) acceleration clauses triggered by entry absent litigation success.

83.    The first type of deterrence clause is an acceleration clause that provides that the delayed entry date to which the first filer has agreed will be accelerated (moved earlier) if any other generic manufacturer (*i.e.*, a second filer) prevails in patent litigation against the brand manufacturer.

84.    Such a clause has the purpose and effect of reducing the incentive of subsequent filers to litigate the brand manufacturers' patents to conclusion.  Absent such a provision, a

second filer could enter the market before the first filer by causing the forfeiture of the first applicant's exclusivity.

85.    As noted above, when a second filer secures tentative approval and a final court judgment that the brand manufacturer's patents are invalid or not infringed, the first filer forfeits its 180-day ANDA exclusivity period if it does not enter the market within 75 days of the court decision.  Thus, for example, a first filer would forfeit exclusivity if it agreed with the brand manufacturer to delay entry until Year 4 and a second filer obtained tentative FDA approval and obtained final judgment of patent invalidity in Year 2.  Having agreed not to begin marketing until Year 4, the first filer would not be able to enter the market within 75 days of the second filer's final judgment in Year 2 and would therefore forfeit its 180-day ANDA exclusivity period.  In such a case, the second filer could enter the market and potentially enjoy a substantial period selling the only ANDA-based generic product on the market.

86.    An acceleration clause triggered by a subsequent applicant's litigation success would deter the subsequent generic from pursuing such a result.  By accelerating the agreed-entry date, such a clause deprives the second generic of the potential period of de facto exclusivity.  As a result, such clauses reduce the incentive of later filers to litigate by permitting first filers to benefit from a litigation success achieved by the second filer's investment in litigation.

87.    Such acceleration clauses result in delayed generic entry in at least two ways: (i) by reducing subsequent filers' incentives to continue litigation they reduce the likelihood that subsequent filers will incur the expenses necessary to achieve earlier entry through litigation; and (ii) by reducing the threat to the first filer's 180-day ANDA exclusivity period, they constitute additional payments to the first filer for agreeing to delay generic entry.

24

88.     A second type of deterrence clause is a term providing that the brand manufacturer will not grant a license to any other generic manufacturer, under authority of the brand manufacturer's NDA, to enter the market before the first filer.  If such a clause simply provides that the first filer gets the benefit of any earlier negotiated entry date, it grants most-favored entry status to the first filer.  Alternatively, such a clause can provide most-favored entry plus status if it provides that the first filer can enter a certain amount of time before any entry date granted to a subsequent filer.

89.     Absent such most-favored entry provisions, a subsequent filer might try to negotiate an earlier entry date by threatening to cause a forfeiture of the first filer's exclusivity by winning the patent litigation.  If the second filer could convince the brand manufacturer to grant it an earlier entry date than the first filer (perhaps because it had a better non-infringement argument than the first filer), it could enjoy a period of de facto exclusivity.

90.     A most-favored entry provision makes such a result less likely by eliminating any possibility of exclusivity for the later generic filer.  A most-favored entry promise by the brand manufacturer also has value to the first filer which further encourages it to delay its entry.

91.     The final type of deterrence clause provides for the first filer's accelerated entry in the event that a subsequent generic filer is able to enter in some way other than litigation.  For example, a subsequent filer may be able to avoid a brand manufacturer's patents by making a section viii statement.  In a section viii statement, the ANDA applicant states that it is not seeking approval for the particular use covered by the brand manufacturer's method-of-use patent.  The FDA can approve an ANDA with a section viii statement without regard to whether any other ANDA applicant is otherwise entitled to a 180-day ANDA exclusivity period.  21 U.S.C. § 355(j)(2)(A)(viii); 21 C.F.R. § 314.94(a)(12)(iii).  By "carving out" from their ANDAs

the uses covered by the brand manufacturer's method-of-use patents, these second filers can enter the market without having won any patent litigation and without a license from the brand manufacturer.

92.     However, an acceleration provision advancing the first filers' entry date in the event that a second filer enters the market through any other means (*i.e.*, without having won patent litigation and without a license) deprives a second filer of the ability to obtain any exclusivity by use of a section viii statement.  The loss of that possibility reduces subsequent filers' incentives to enter the market using a section viii statement and again constitutes a transfer of value for which the first filer will accept a later entry date.

93.     In short, Hatch-Waxman leaves open at least three pathways for second filers to enter the market before a first filer that has agreed to delay entry.  A second filer may be able to enter before the first filer by (1) winning the patent litigation and causing the first filer to forfeit its exclusivity; (2) negotiating an earlier licensed entry date with the brand manufacturer; or (3) using a section viii statement.  However, brand manufacturers can decrease the likelihood of such subsequent entry with deterrence clauses that decrease the incentives of the subsequent filers to take such actions.

## V.     OPERATIVE FACTS

### A.     Bausch's Patents on Xifaxan Were Weak.

94.     Over time, Bausch filed, prosecuted, and listed in the Orange Book at least 30 patents claiming Xifaxan 550 mg or its uses.  But those patents were weak and could not prevent generic competition.  In several cases, the patents did not even claim Xifaxan 550 mg or any of its uses and therefore could not lawfully be listed in the Orange Book.

95.     Rifaximin, the active ingredient in Bausch's Xifaxan, has been widely used as an antibiotic for decades.

96.     Xifaxan was the crown jewel of Salix's business and a primary reason that Bausch acquired Salix in 2015.

97.     Sales of Xifaxan grew at a rapid pace, from $979 million in 2017, to $1.195 billion in 2018, to $1.452 billion in 2019.  As of 2024, Bausch's annual U.S. sales of Xifaxan were approximately $1.99 billion.  Virtually all of those sales were of the 550 mg strength, and the majority were for treatment of IBS-D.

98.     Symptoms of irritable bowel syndrome ("IBS") include abdominal pain, bloating, frequency, urgency, gas, and changed bowel habits, such as diarrhea, constipation, or alternating diarrhea and constipation.  Subtypes of IBS include IBS with diarrhea (IBS-D), IBS with constipation (IBS-C), or IBS with alternating diarrhea and constipation (IBS-A).

99.     IBS may be caused, for example, by abnormal motility, abnormal muscular coordination, changes in the microbiome in the colon or small intestine, intolerance to certain foods, or psychological factors.

100.    On December 21, 2001, Salix submitted NDA No. 021361 for rifaximin tablets to be marketed and sold under the brand name Xifaxan 200 mg, indicated for the treatment of patients (>12 years of age) with travelers' diarrhea caused by noninvasive strains of E. coli.  The FDA approved the NDA on May 25, 2004.  The FDA approved 200 mg Xifaxan tablets for use in the United States in 2004 for the treatment of travelers' diarrhea.

101.    On June 24, 2009, Salix submitted NDA No. 022554 for rifaximin tablets to be marketed and sold under the brand name Xifaxan 550 mg, indicated for the reduction in risk of overt hepatic encephalopathy recurrence in adults.  On June 7, 2010, Salix submitted a Supplemental New Drug Application ("sNDA") for Xifaxan 550 mg, introducing a new

indication for the treatment of IBS-D in adults. The IBS-D subtype comprises about one-third of IBS patients.

102.    On March 24, 2010, the FDA granted the application with respect to the hepatic encephalopathy indication.

103.    On May 27, 2015, FDA approved the sNDA for Xifaxan 550 mg for the treatment of IBS-D in adults.

104.    By 2016, Salix had obtained and listed in the FDA's Orange Book 22 patents claiming aspects of Xifaxan 550 mg and its uses with expiration dates ranging from August 11, 2019 to October 2, 2029. By 2023, the patents listed in the Orange Book for Xifaxan 550 mg and its uses no longer included the patents that had already expired in 2019, but the number of listed patents had grown to 24, and by 2024 had grown further to 26.

105.    The earliest-expiring patents listed in the Orange Book claimed methods of using the prior art rifaximin compound (the active ingredient in Xifaxan) for various indications such as treating irritable bowel syndrome and bloating. Those patents expired on August 11, 2019.

106.    The remaining listed patents have expiration dates ranging from June 19, 2024 to October 2, 2029. They fall into four general categories: (i) patents claiming various crystalline forms or polymorphs of rifaximin ("Polymorph Patents"); (ii) patents claiming methods of treating IBS with rifaximin; (iii) patents claiming methods of treating IBS-D with rifaximin ("IBS-D Patents"); and (iv) patents claiming methods of using rifaximin to treat hepatic encephalopathy, as shown below:

| Patent | Expiration | Submission | Coverage |
|---|---|---|---|
| 6,861,053 | 8/11/2019 | n/a | IBS method of treatment |
| 7,452,857 | 8/11/2019 | n/a | IBS method of treatment |
| 7,605,240 | 8/11/2019 | n/a | IBS method of treatment |
| 7,718,608 | 8/11/2019 | n/a | IBS method of treatment |
| 7,935,799 | 8/11/2019 | n/a | IBS method of treatment |
| 7,045,620 | 6/19/2024 | n/a | Polymorph |
| 7,612,199 | 6/19/2024 | 4/7/2011 | Polymorph |
| 7,902,206 | 6/19/2024 | 4/7/2011 | Polymorph |
| 8,158,644 | 6/19/2024 | 5/9/2012 | Polymorph |
| 8,158,781 | 6/19/2024 | 5/8/2012 | Polymorph |
| 8,835,452 | 6/19/2024 | 10/1/2014 | Polymorph |
| 8,853,231 | 6/19/2024 | 11/5/2014 | Polymorph |
| 7,915,275 | 2/23/2025 | 6/18/2015 | Polymorph |
| 7,906,542 | 6/1/2025 | 4/7/2011 | Polymorph |
| 8,518,949 | 2/27/2026 | 9/16/2013 | Polymorph |
| 8,741,904 | 2/27/2026 | 7/11/2014 | Polymorph |
| 9,271,968 | 2/27/2026 | 6/8/2016 | Polymorph |
| 10,703,763 | 2/27/2026 | 7/14/2020 | Polymorph |
| 8,193,196 | 9/2/2027 | 6/18/2012 | Polymorph |
| 10,456,384 | 2/26/2029 | 11/12/2019 | IBS-D method of treatment |
| 10,765,667 | 2/26/2029 | 10/19/2020 | IBS-D method of treatment |
| 11,564,912 | 2/26/2029 | 2/2/2023 | IBS-D method of treatment |
| 11,779,571 | 2/26/2029 | 10/23/2023 | IBS-D method of treatment |
| 8,309,569 | 7/18/2029 | 6/18/2015 | IBS-D method of treatment |
| 8,829,017 | 7/24/2029 | 9/9/2014 | HE method of treatment |
| 8,946,252 | 7/24/2029 | 2/3/2015 | HE method of treatment |
| 9,421,195 | 7/24/2029 | 10/11/2016 | HE method of treatment |
| 9,629,828 | 7/24/2029 | 4/27/2017 | HE method of treatment |
| 10,314,828 | 7/24/2029 | 7/1/2019 | HE method of treatment |
| 10,335,397 | 7/24/2029 | 7/24/2019 | HE method of treatment |
| 10,709,694 | 7/24/2029 | 7/23/2020 | HE method of treatment |
| 8,642,573 | 10/2/2029 | n/a | HE method of treatment |
| 8,969,398 | 10/2/2029 | 3/4/2015 | HE method of treatment |

107.    Like many active pharmaceutical ingredients, rifaximin may exist in a number of different crystalline forms (known as polymorphs).  The '620, '199, '206, '275, '542, '644, '781, '196, '949, '904, '452, '231, '968, and '763 patents claim some of these rifaximin polymorphs.

108.    For example, the '620, '199, '206, '275, '542, '644, '452, '231 and '781 patents claim the alpha, beta, and gamma rifaximin polymorphs, including a specific process to make them, certain compositions containing them, and uses for them. The '196, '949, '904, and '968 patents claim the delta and epsilon rifaximin polymorphs, including a specific process to make them, compositions containing them, and uses for them. And, the '763 patent claims methods of treatment by administering the delta and epsilon rifaximin polymorphs.

109.    All these Polymorph Patents were subject to validity challenges. Moreover, they claimed only particular polymorphs, specific methods of making them, particular compositions, and specific uses. As a result, a generic manufacturer could easily avoid infringing them even if they were valid by avoiding the use of the specific polymorphs, methods, compositions, and uses.

110.    The patents that expired in 2019 claimed particular methods of using rifaximin in patients with IBS, but without specific dosing regimens. Some of the patents expiring after 2019 are directed to the same or similar treatment indications as those that expired in 2019 but have claims reciting specific dosing regimens or target patients. For example, the '608 and '799 patents, both of which expired on August 11, 2019, claimed a method of treating a subject suffering from IBS and a method of treating a subject who has relapsing diarrhea from small intestinal bacterial overgrowth comprising administering rifaximin to the subject in need. The later-expiring '569 patent is directed to certain methods of using rifaximin at a dose of 1650 mg/day for 14 days for the treatment of IBS-D in order to achieve a "durability of response" (about 12 weeks of adequate relief of symptoms). Similarly, the '667 patent claims a method of treating IBS in a subject 65 years of age or older by administering 550 mg of rifaximin three

times a day for 14 days, and also had dependent claims claiming treatment of specific symptoms or types of IBS such as where the IBS is IBS-D.

111.    Regardless of the merits of the patents expiring in 2019, none could prevent generics from entering the market after the patents' August 11, 2019 expiration date.  As for the later-expiring patents, all are subject to serious validity challenges and/or claim specific indications that a generic manufacturer easily could avoid using section viii statements.

112.    Nine listed patents claim methods of using rifaximin to treat hepatic encephalopathy ("HE"), a neuropsychiatric syndrome that occurs as a complication of severe liver disease.

113.    The '573 patent covers certain methods of "maintaining remission of hepatic encephalopathy" by "administering . . . rifaximin daily to a subject for a period of about 12 months or longer."

114.    The '017 patent covers certain methods of using rifaximin at a dose of 1,000-1,200 mg/day and "cautiously" for the treatment of hepatic encephalopathy in patients who also have travelers' diarrhea and either a Child-Pugh Class C score or a model end stage liver disease score of 25 or greater.

115.    The '252 patent covers certain methods of using rifaximin to reduce the risk of HE recurrence in certain patients who have travelers' diarrhea and hepatic insufficiency.

116.    The '398 patent covers certain methods of using "rifaximin daily for a period of about 12 months or longer" to decrease a subject's risk of an HE breakthrough episode.

117.    The '195 patent covers methods of using rifaximin at a dose of 1,000-1,200 mg/day "for a period of 12 months or longer" to reduce the risk of HE recurrence in adults.

118.    U.S. Patent No. 9,629,828 covers methods of using rifaximin at a dose of 1,000-1,200 mg/day to reduce the risk of HE recurrence in certain patients who have travelers' diarrhea and chronic liver disease.

119.    The '694 patent covers a method of reducing a subject's risk of experiencing a breakthrough overt HE episode, comprising administering to the subject between about 1000 mg to about 1200 mg of rifaximin daily for a period of about 6 months or longer.

120.    U.S. Patent No. 10,314,828 covers a method of maintaining remission of HE in a subject by administering between 1000 mg to 1200 mg of rifaximin daily for a period of 12 months or longer.

121.    The '397 patent covers a method of reducing a subject's risk of experiencing a breakthrough overt HE episode, comprising administering to the subject between about 1000 mg to about 1200 mg of rifaximin daily for a period of about 12 months or longer.

122.    Because these patents all specifically claim methods of treating HE, a generic could easily avoid their infringement by carving out these HE indications in its labeling using a section viii statement.

123.    Accordingly, none of the post-2019-expiring listed patents could have prevented the launch of generic Xifaxan.

124.    In fact, the Court of Appeals for the Federal Circuit affirmed a district court's judgment finding that the claims of the IBS-D and Polymorph Patents that Bausch asserted against a manufacturer of generic Xifaxan were invalid for obviousness.  Specifically, the court invalidated the claims of the representative later-expiring '569 and '667 patents directed to treating IBS-D with 550 mg rifaximin three times a day for 14 days and claims of the

representative later-expiring '199 and '206 patents directed to rifaximin form beta.  *See Salix Pharms., Ltd. v. Norwich Pharms. Inc.*, 98 F.4th 1056 (Fed. Cir. 2024).

125.     The substantial vulnerability and weakness of all the IBS method of treatment and Polymorph Patents meant that none stood as legitimate impediments to generic competition.  By listing them in the Orange Book, however, Bausch ensured that every potential generic competitor would have to address them.

126.     Actavis Laboratories FL, Inc. ("Actavis"), a generic manufacturer subsequently acquired by Teva, was the first to file an ANDA seeking approval to manufacture, market, and sell a generic version of Xifaxan 550 mg.  Actavis filed ANDA No. 208959 in or about February 2016 directed to Xifaxan 550 mg.  As the first generic to submit a substantially complete ANDA for rifaximin, Actavis was eligible for the 180-day ANDA exclusivity period for generic Xifaxan 550 mg tablets.

127.     On February 11, 2016, Actavis sent a Paragraph IV certification to Bausch asserting the invalidity, unenforceability, or noninfringement of the following patents by Actavis's ANDA: the '569 patent; the '573 patent; the '017 patent; the '252 patent; the '398 patent; the '620 patent; the '199 patent; the '206 patent; the '542 patent; the '275 patent; the '644 patent; the '781 patent; the '196 patent; the '949 patent; the '904 patent; the '452 patent; the '231 patent; the '053 patent; the '857 patent; the '240 patent; the '608 patent; and the '799 patent.

128.     Actavis provided Bausch with the factual and legal basis supporting its position that these patents were invalid, unenforceable, or would not be infringed by Actavis's proposed ANDA products.

129.     On March 23, 2016, Bausch filed suit against Actavis in the U.S. District Court for the District of Delaware, alleging that Actavis infringed one or more claims of the '569, '573,

'017, '252, '398, '620, '199, '206, '542, '275, '644, '781, '196, '949, '904, '452, '231, '053, '857, '240, '608, and '799 patents.  Pursuant to the Hatch-Waxman Amendments, the mere filing of the action triggered an automatic 30-month stay of the approval of Actavis's ANDA.  Later in the litigation, Bausch amended its complaint to add new allegations that Actavis also infringed the '968 and '195 patents.

130.    Actavis filed an answer to Bausch's complaint in which it denied Bausch's allegations and asserted affirmative defenses and counterclaims: (1) denying that its rifaximin tablets would infringe claims of any of the asserted patents, (2) alleging that the asserted patents were invalid, and (3) alleging that the asserted patents were unenforceable due to Bausch's inequitable conduct during prosecution.

131.    On June 14, 2016, Bausch filed its first amended complaint, adding the '968 patent to the suit.  Actavis filed its amended answer and counterclaims on July 1, 2016.  Bausch filed its reply on July 18, 2016.

132.    On August 2, 2016, Teva acquired Actavis and thereby became the owner of ANDA No. 208959 and a participant in the litigation (the "Bausch-Teva Litigation").

133.    On October 5, 2016, the court scheduled a seven-day trial to begin on January 29, 2018.

134.    On December 12, 2016, Bausch filed its second amended complaint, adding the '195 patent to the suit.  Teva filed its second amended answer and counterclaims on December 27, 2016.  Bausch filed its Reply on January 10, 2017.

135.    On May 10, 2017, at Teva's request, the parties agreed to a roughly one-year suspension of the litigation that would last until April 30, 2018.  All scheduled litigation deadlines and events, including the January 2018 trial date, were indefinitely removed from the

Court docket.  The parties subsequently requested that the stay be extended four more times, ultimately extending the hiatus to October 1, 2018.

136.    The Bausch-Teva Litigation involved 24 patents (either asserted by Bausch against Teva or introduced by Teva in its declaratory judgment counterclaims).  Teva had strong defenses to all those patents.  None presented a reason for Teva to agree to wait until 2028 to enter the market with generic Xifaxan 550 mg.

137.    As described above, the patents asserted against Teva fell into four groups: IBS method of treatment patents expiring on August 11, 2019; IBS-D Patents expiring in 2029; Polymorph Patents expiring between June 2024 and September 2027; and HE method of treatment patents expiring in 2029.

138.    By the time Bausch and Teva settled the patent case in September 2018, the IBS method of treatment patents expiring on August 11, 2019 had less than one year of life left.  Thus, even if they were valid, infringed and enforceable, they presented no reason for Teva to agree to wait a day beyond August 11, 2019 to enter the market – let alone until 2028.

139.    The IBS-D Patents with specific dosing regimens and/or target subjects expiring in 2029 were exceptionally vulnerable to being invalidated.  Teva had strong validity challenges to them.  In fact, the Court of Appeals for the Federal Circuit ultimately affirmed a district court's invalidation of the '569 and '667 patents as representative of the IBS-D Patents in the later *Salix v. Norwich* action.

140.    Similarly, the Polymorph Patents were also exceptionally vulnerable to being invalidated.  Teva had strong validity challenges to them, as again evidenced by the invalidation (in the *Salix v. Norwich* action) of the '199 and '206 patents, which claimed the beta polymorphic form of rifaximin and were tried as representative of the Polymorph Patents.

141.    The latest-expiring polymorphic rifaximin patent was the '196 patent, which claimed processes for making the delta and epsilon polymorphic forms of rifaximin and compositions containing them.  Even if the patent were valid, it expires on September 2, 2027, and could not possibly justify Teva waiting until 2028 to enter the market.  The same is true of the earlier-expiring '949 and '762 patents (directed to the delta and epsilon forms of rifaximin), which expire on February 27, 2026.

142.    Teva also had solid noninfringement defenses to the '949 and '762 patents, claiming the delta and epsilon polymorphic rifaximin patents.  Those patents expire on February 27, 2026, well before the 2028 entry date that Teva agreed to, and the Teva generic product does not use the delta or epsilon forms of rifaximin.

143.    As for the patents directed to the HE indication, separate and apart from its invalidity and noninfringement defenses, Teva could have eliminated all of those patents as a barrier to entry by carving out the HE indications using a section viii statement.

## B.    Bausch Paid Teva to Delay Its Entry

144.    Recognizing that the weakness of its patents made it vulnerable to generic competition, Bausch paid Teva to delay its entry into the market in order to protect its massive Xifaxan revenues.

145.    Bausch has acknowledged to its investors that Xifaxan sales accounted for "approximately 80% of the Salix segment revenues and approximately 21% of [Bausch's overall] revenues for 2023 and 2022, respectively."  In comparison, "no other single product group represented 10% or more of the company's Salix segment product sales."  Bausch has cautioned since 2017 that if Xifaxan's patents could not be successfully defended, the company could face losing "a significant portion of sales in a very short period."  Xifaxan 550 mg revenue was so critical that any loss of patent protection sooner than anticipated would adversely impact

Bausch's future cash flows, result in shortened useful lives of Xifaxan's intangible assets, increase amortization expenses, and "materially affect company operations."

146.     On September 12, 2018, Bausch announced the settlement of the pending litigation against Teva relating to the alleged infringement of Bausch's Xifaxan 550 mg patents. Bausch and Teva settled the patent lawsuit before the Court issued a ruling on the validity and/or infringement of Bausch's patents. That settlement included large and unexplained reverse payments to Teva to delay its market entry until January 1, 2028 and effectively blocked other generic entrants as well.

147.     Bausch's press release announcing the settlement stated that Teva was given the option, beginning on January 1, 2028 (or earlier if another generic Xifaxan product entered the market), to "(1) market a royalty-free generic version of XIFAXAN 550 mg tablets, should it receive approval from the U.S. Food and Drug Administration on its Abbreviated New Drug Application, or (2) to market an authorized generic version of XIFAXAN 550 mg tablets with drug supply being provided by Salix. In the case an authorized generic is marketed, the volume of the authorized generic will be subject to manufacturing and supply quantities until final patent expiry, and Bausch Health will receive an undisclosed share of the economics from [Teva] on its sales of an authorized generic."

148.     For decades, it has been part of Teva's corporate strategy to settle Hatch-Waxman patent cases in ways that provide it "value" beyond what the statute itself provides. The principal way that it extracts this value is by insisting on contract provisions that create "exclusivities" that the statute itself does not provide.

149.     These contractual exclusivities – none of which are authorized by the Hatch-Waxman Amendments – include no-AG clauses and deterrence clauses like those described

above.  In 2018, it was common for Teva to insist on such provisions as part of settling Hatch-Waxman patent litigations.

150.     For its part, Salix's parent company (then known as Valeant) had such an unsavory history of anticompetitive conduct that it was hauled before a Congressional Committee in 2016.  Representative Cummings highlighted Salix's exploitation of a brand prescription drug called Glumetza for which Salix had suddenly raised the price by 750%. Developments in the Prescription Drug Market: Oversight Hearing Before the House Comm. On Oversight and Government Reform, 114 Cong., at 3, 119 (Feb. 4, 2016), *available at* https://www.govinfo.gov/content/pkg/CHRG-114hhrg25500/pdf/CHRG-114hhrg25500.pdf.  He noted that Salix had "raise[d] the prices astronomically [for a] temporary period of time before other competitors enter the market."  *Id.*

151.     In order to placate Congress, Valeant's then-CEO testified to the U.S. Senate on April 27, 2016 that "it was a mistake to pursue, and in hindsight I regret pursuing, transactions where a central premise was a planned increase in the prices of the medicines[.]"  Statement of J. Michael Pearson before the Senate Special Committee on Aging (Apr. 27, 2016), *available at* https://www.aging.senate.gov/imo/media/doc/SCA_Pearson_4_27_16.PDF.  And he gave Congress the false comfort that, going forward, "[w]e expect our pricing actions to track industry norms."  *Id.*

152.     Yet, at that very moment, Valeant and Salix were concealing from Congress exactly why Salix was able to take the dramatic price increases on Glumetza.  Salix had paid its generic competitor to delay entry into the market.  In that case, the payment took two basic forms: (1) a no-AG clause; and (2) deterrence clauses.  Salix took the price increases on Glumetza during the period of delayed generic entry that it had bought from the generic

competitor in exchange for those payments. *See In re Glumetza Antitrust Litig.*, 2021 WL 1817092 (N.D. Cal. May 6, 2021) (denying summary judgment).

153.    In the wake of the Congressional investigations, in 2016, Valeant got a new CEO and a new General Counsel.  On July 13, 2018, Valeant changed its name to Bausch Health Companies Inc. – a public-relations gambit to try to distance itself from its unsavory past.

154.    But the new management team was keenly aware of the enormous profits that Salix gained from the reverse payments that it had made – and failed to disclose to Congress – with respect to Glumetza.  And in 2018, when generic Xifaxan was poised to enter the market, Bausch and Salix were under enormous financial pressure.  Bausch was in the midst of a multi-year effort to restructure its operations and to pay off debt.  And Xifaxan was key to those efforts – Salix had recently heavily invested in a sales force centered on Xifaxan, the company's most significant product.

155.    So, Bausch responded to the prospect of generic Xifaxan with the same anticompetitive strategy it had used with respect to Glumetza.  Bausch paid its generic competitor to delay entry so that it could continue to reap unwarranted profits on a critical drug. To do so, it used the same type of reverse payments that it had used with respect to Glumetza, namely: (1) a no-AG agreement and (2) deterrence clauses.

156.    Teva was the first filer and entitled to six months of exclusivity vis-à-vis other ANDA filers.  The disclosure in the press release announcing the settlement suggests that Bausch agreed not to launch its own AG in competition with Teva.  That agreement will allow Teva to sell its generic product at a higher price, and to make twice as many sales, as it would if Bausch were to market an AG in competition with Teva.  Those higher prices come out of the pockets of purchasers.

157.    According to the press release, the settlement agreement gives Teva the option of either launching its own ANDA product, assuming it received FDA approval, or electing to sell Bausch's Xifaxan authorized generic subject to royalties and a supply limitation.  Other Hatch-Waxman settlements have used royalties and quantity limits to create strong economic incentives for the generic to elect to sell the authorized generic rather than its own ANDA generic and for the brand to refrain from competing with the first filer by selling a competitive AG during the first filer's exclusivity period.  It appears as though the contractual arrangement that Bausch and Teva reached is likely a thinly disguised agreement by Bausch not to market an authorized generic during Teva's 180-day exclusivity period.  As described above, Bausch's patents were exceptionally weak, and Teva was likely to be able to launch by prevailing on them.  Its agreement to stay off the market until 2028 is likely a result of an understanding that it would not face competition from a Bausch generic during the first-to-file exclusivity period.  This inference is particularly plausible given the histories of these companies described above.  The economics of the option described in the press release further suggests that Bausch and Teva reached such an agreement.

158.    At the time of the settlement in 2018, Bausch and Teva could reasonably have expected annual sales of 550 mg Xifaxan to be approximately $2.2 billion in 2028.  As noted, in 2024, annual sales of Xifaxan reached approximately $2 billion, and they are virtually certain to reach $2.2 billion level in 2025 or 2026.  For purposes of considering the likely effect of the option described in the press release, we will conservatively assume that Bausch and Teva expected sales of $2.2 billion in 2028.

159.    If Teva elected to market an ANDA product without any volume limitation, it would assume that there would be two generic competitors on the market during the 180-day

period – Teva's ANDA product with no quantity limitation and Bausch's authorized generic. Approximately $1.0 billion of brand sales would be substituted to generic sales during the 180 days of Teva's exclusivity ($2.2 billion annual brand sales * 90% generic erosion * 0.5 years). The two generics would be priced at approximately 50% of the brand price and would split the generic unit sales equally. Teva's generic sales during the 180-day period would total $1.0 billion sales * 50% of the brand price with two generics * 50% of the generic market = $250.0 million. Bausch's authorized generic sales would be roughly the same.

160.    If Teva elected to market the AG with a volume limitation, Bausch could theoretically launch a second AG. However, under reasonable assumptions, it would be foolish for Bausch to do so. Given that Teva agreed to a volume limitation on Teva's sales of an AG, Bausch's launch of a second AG would only serve to expand the generic market at the expense of Bausch's higher-priced brand sales.

161.    Any volume limitation that is less than the expected rate of generic substitution would make it unreasonable for Bausch to launch a second AG to compete with Teva. For example, suppose that Teva agreed to a volume limitation of 60% of the total market and that the expected generic substitution rate is 90%. If Bausch does not launch an AG, and Teva is the only generic on the market, Teva's generic will take 60% of unit sales (the maximum it is permitted) and Bausch's brand product will take the other 40%. However, if Bausch were to launch a second AG, the generic substitution rate would increase to 90% and brand sales would drop to 10%. Thus, Bausch's launch of a second AG would result in an additional 30% of the higher-priced brand market being converted to lower-priced authorized generic sales. Bausch would prefer either outcome to losing an additional 30% of its sales to Teva but would obviously prefer to make the 30% of sales at the higher brand price than at the lower generic price.

162.     Bausch would only launch a second AG if Teva's volume limit were equal to or greater than the total demand for generic Xifaxan.  If Teva were allowed to fully satisfy generic demand, it would make economic sense for Bausch to launch a second AG to compete with Teva since that competition would not cause any further erosion of the brand market.  It is unlikely that Bausch and Teva would have agreed to a volume limit for AG sales that equaled or exceeded the total expected generic substitution rate because it would be unnecessary to agree on such a limit.  If they intended Teva to be able to fully satisfy generic demand, the market would impose that limit without any need for an express agreement on the volume limit.

163.     While the press release suggests that Teva had an option to sell an unlimited amount of generic rifaximin under its ANDA, the economics of generic pharmaceuticals would make it unlikely for Teva to exercise that option under reasonable assumptions.

164.     It will almost always be economically preferable for a generic manufacturer to sell the brand's AG instead of its ANDA product even if the sales of the AG are subject to a quantity limit.  Absent competition from a brand selling its own AG, the generic is able to take the entire generic market and to sell at higher prices.  Thus, under reasonable assumptions, if Teva can choose between selling its ANDA product and selling the brand's AG without competition, Teva would be better off selling the AG because it can sell more units at a higher price.

165.     For example, assume that the volume limit imposed on Teva is 60% of total market units and that the generic price with only one generic on the market is 85% of the brand price.  As explained above, if Teva chooses to launch its ANDA product, it will make approximately $250 million in sales during its first six months on the market.  However, if Teva chooses to launch the AG, it will make $2.2 billion in annual sales * .5 years * 60% volume limit

* 85% of the brand price with one generic = $561 million, more than twice as much.  If the volume limitation is 67% and Teva chooses to launch the AG, it will make even more – $2.2 billion in annual sales * .5 years * 67% volume limit * 85% of the brand price = $626 million.

166.    The only economic function of the quantity limitation is to dissuade Bausch from marketing a second authorized generic during Teva's ANDA exclusivity period.  So long as the quantity limit is less than the total expected generic conversion rate, the brand manufacturer will choose not to launch a second generic, and the generic manufacturer will choose to sell the AG rather than its ANDA product.

167.    Brand manufacturers and generic competitors can agree on generic supply agreements as part of Hatch-Waxman settlements without agreeing to limit generic competition.  Rather than agreeing on a limited quantity AG license, the brand and generic can enter into an arms-length supply agreement in which the generic agrees to purchase generic product at market prices without any volume limit.  In such a case, the brand would still be incentivized to launch its own AG in competition with the AG marketed by the first filer.  For example, when the first filer for Forfivo XL launched an AG, the brand launched a competing AG the same day.  Other examples where the brand and generic sold AGs in competition without any volume limits on the generic include Silenor, Flector, and Zyclara.

168.    Bausch also paid Teva to delay its entry into the market by agreeing to valuable deterrence provisions that discouraged subsequent generic manufacturers from trying to launch before Teva.  Bausch agreed to these deterrence provisions in exchange for Teva's agreement to delay entry until January 2028.

169.    When negotiating the settlement agreement, Bausch and Teva knew that other generic manufacturers posed a competitive threat to their agreement to divide monopoly profits.

In September 2018, Xifaxan 550 mg already had blockbuster level sales (*i.e.*, annual sales exceeding $1 billion), and Teva was about to agree to delay unrestrained competition for more than nine years when only weak patent protection for the brand existed. This delay created an opportunity for subsequent generic manufacturers to try to enter the market before Teva and to secure the benefits of a period of de facto market exclusivity.

170.    As explained above, there are at least three pathways for subsequent filers to enter the market ahead of a first filer that agrees to delay entry: (a) via successful litigation that results in a final judgment that causes a forfeiture of the first-to-file exclusivity; (b) via a license from the brand manufacturer; and (c) via section viii statements.

171.    Bausch agreed to contractual provisions designed to disincentivize subsequent generics from taking advantage of any of these pathways. According to the press release announcing the settlement, Teva was permitted to launch "earlier if another generic rifaximin product is granted approval and starts selling or distributing such generic rifaximin product before Jan. 1, 2028." Thus, it appears that Teva's launch date could be accelerated in at least three situations.

172.    First, by a subsequent generic obtaining an appellate court ruling affirming that all the patents entitling Teva to 180-day exclusivity were invalid and/or not infringed.

173.    Second, by a subsequent generic entering the market by any means other than litigation such as by making a section viii statement.

174.    Third, by a subsequent generic obtaining a license from Bausch permitting it to enter the market before Teva's delayed entry date of January 1, 2028. This contractual provision was valuable to Teva because it significantly reduced the chance that any subsequent filer would find it worthwhile to invest the resources necessary to launch generic Xifaxan earlier than the

entry date that Bausch paid Teva to accept.  That is because any subsequent generic that succeeded in getting on the market earlier would have to share the market with Teva.  Thus, the acceleration clause acted to disincentivize other generic manufacturers from trying to launch earlier than the date agreed to by Bausch and Teva.

175.    In exchange for the no-AG payment and these additional payments from Bausch, Teva agreed to delay entry into the market until January 1, 2028.

### C.    The Payments Were Large and Unexplained.

176.    The payments from Bausch to Teva were sufficiently large to induce Teva to accept a January 2028 entry date in 2018 in lieu of seeking an earlier entry by defeating Bausch's weak patents in litigation.

177.    As noted above, without the no-AG payment, Teva would expect competition from Bausch's authorized generic during its 180-day ANDA exclusivity period.  As a result, it would expect to make sales of approximately $250 million during that time.  In contrast, the no-AG agreement grants exclusivity to Teva, permitting it to capture the entire generic market at a higher price during its exclusivity period and more than doubles Teva's expected sales.

178.    As shown above, assuming a volume limit of 60% and a price with one generic on the market of 85% of the brand price, Teva could expect to make $2.2 billion in annual sales * .5 years * 60% volume limit * 85% price with one generic on the market = $561 million.  Thus, the size of the payment to Teva is the difference between Teva's sales with the no-AG agreement ($561 million) and its sales in a competitive market ($250 million), or $311 million.  The exact volume limitation contained in the Bausch/Teva agreement has not been disclosed, and the size of the payment could be higher or lower than $311 million depending on the exact volume limitation agreed to, but the payment is under any circumstances large and unexplained.

179.    The no-AG provision also represented an economic sacrifice by Bausch.  In a competitive market, Bausch would have earned $250 million (about equal to what Teva would have earned) by marketing its own authorized generic.  Of course, the anticompetitive profits that Bausch will earn by delaying generic competition until 2028 will far outweigh that sacrifice.

180.    The value of the no-AG provision is large because it far exceeds any reasonable estimate of the litigation costs that Bausch saved by settling the patent case.  It is unlikely that it would have cost Bausch any more than $10 million to complete the litigation.  Thus, Bausch's agreement to forgo AG sales of $250 million cannot be explained as merely an effort to avoid litigation costs.  It was a successful effort to impair and delay generic competition.

181.    The press release announcing the settlement agreement states that the agreement provides for Bausch to receive an "undisclosed share of the economics" of an AG sold by Teva. Any profit share on AG sales between Bausch and Teva would reduce estimates of the size of the no-AG payment but is unlikely to eliminate its anticompetitive effects.

182.    Other reverse payment cases show that brand and generic manufacturers have negotiated royalty rates that provide additional incentives for the brand to refrain from introducing an AG.  *See In re Xyrem (sodium oxybate) Antitrust Litig.*, 2024 WL 4023561, at *7 (N.D. Cal. Aug. 26, 2024) (finding that factfinder could conclude that royalty structure in patent settlement agreement was part of an "implicit agreement" to incentivize brand manufacturer not to market its own AG alongside that sold by first ANDA filer); *In re Amitiza Antitrust Litig*, 2022 WL 17968695, at *3 (D. Mass. Dec. 27, 2022) (internal quotation marks omitted) (describing allegations that royalty structure in settlement "created economic disincentives that made it less profitable to launch an AG").

183.    Even if Bausch and Teva agreed to split the revenue from the AG 50/50, Bausch's agreement not to launch a competitive AG would still generate a large payment to Teva that exceeded the cost of continued litigation.  For example, if the royalty rate were 50% in the example above, Teva would split the $581 million in AG sales with Bausch and be left with $280.5 million, which is still $30.5 million more than the $250 million that it would expect to earn by competing against an AG sold by Bausch.  Without the details of the agreement between Bausch and Teva and their sales forecasts, it is impossible to make a precise estimate of the value of the no-AG provision.  However, these examples show that an agreement to share generic exclusivity produces substantially more value than competition.  Whatever the details of the profit share on an AG, Teva received sufficient value to convince it to delay its launch of generic Xifaxan until 2028 even though Bausch's patents were exceedingly weak and unlikely to prevent Teva from selling generic Xifaxan to treat IBS-D though 2028.

### D.    But For the Payments, Generic Competition Would Already Have Begun.

184.    Bausch's unlawful reverse payment agreement with Teva has forestalled the generic entry of Xifaxan 550 mg.  Notwithstanding the size of the market and the number of generic competitors that have sought FDA approval to market a generic version of Xifaxan, there is no generic version of Xifaxan available today, and it is likely that no generic version of Xifaxan will be available until January 2028.  Once generic Xifaxan is available, Teva's sales will be limited by the terms of the settlement agreement and generic prices will be significantly higher than they would have been absent the unlawful payments and delay.  Absent the unlawful payments, Teva would have already entered the market and other competitors would have followed once its first-to-file exclusivity expired.

185.    Before Bausch paid Teva to delay generic entry, Bausch concluded that generic Xifaxan 550 mg was likely to be available by 2024.  However, after its settlement with Teva, it adjusted its forecasts to show that generic entry would be delayed until January 1, 2028.

186.    As Bausch explained in its FY 2019 SEC filing:

> Effective September 12, 2018 [the date of the Teva deal], the Company changed the estimated useful life of its Xifaxan 550 mg®-related intangible assets due to the positive impact of an agreement between the Company and [Teva] resolving the intellectual property litigation regarding Xifaxan 550 mg® tablets. Under the agreement, the parties have agreed to dismiss all litigation related to Xifaxan 550 mg® tablets, and all intellectual property protecting Xifaxan 550 mg® will remain intact and enforceable. As a result, the useful life of the Xifaxan 550 mg® related intangible assets was *extended from 2024 to January 1, 2028*. (emphasis added).

187.    Stock analysts typically predict the likely outcome of pharmaceutical patent cases given the substantial effect of generic entry on brand company earnings.  As a result, if a settlement agreement results in an outcome significantly better than expected in the litigation, as would be the case if the brand paid the generic to accept a date later than warranted by the patent merits, the brand company's stock price will surge dramatically following the announcement of the settlement.

188.    Here, the financial markets recognized the deal's enormous value to Bausch.  On September 12, 2018, when Bausch announced the entry date that it had paid Teva to accept, its stock price skyrocketed by 14% on the first day of trading after the announcement and remained elevated in the ensuing days.

189.    The daily changes in the value of Bausch's stock (its market capitalization) from September 4, 2018 until September 19, 2018 are shown in the following graph:



190.    In a single day, the Teva deal added a billion dollars to Bausch's market capitalization.  That deal pushed Teva's entry date significantly later than merited by the strength of Bausch's patents.  Absent the unlawful deal, Teva would have entered the market far earlier than January 1, 2028.

191.    Bausch did not advise investors that it had paid Teva to accept a decade-long delay in entering the market.  Instead, it misleadingly stated in its SEC filings that "[t]he Company will not make any financial payments or other transfers of value as part of the agreement."

192.    Absent the unlawful reverse payment, a reasonable generic company in Teva's position would have launched generic Xifaxan 550 mg much earlier than January 1, 2028, either: (i) at risk during the pendency of the patent litigation; (ii) after litigating and winning the patent

litigation; or (iii) under a lawful license from Bausch that did not include a reverse payment. Absent the unlawful reverse payments, Teva would have begun marketing generic Xifaxan 550 mg prior to the filing date of this lawsuit and many years earlier than the agreed January 2028 entry date.

193.    Notably, the payments that Bausch made to Teva were more than Teva could have made *even if it had litigated and won the patent case.*  As described in detail above, if Teva had litigated and won, it would have made about $250 million during the 180-day ANDA exclusivity period.  Assuming a 60% volume limitation, Bausch's payments were worth $311 million more than Teva could have made by competing.

194.    Most Hatch-Waxman patent cases are settled without reverse payments. Accordingly, it is likely that Bausch and Teva would have been able to settle the patent case lawfully without a reverse payment and with an earlier entry date.

195.    However, if the parties had not settled absent the reverse payments, Teva would have won the patent case.  As discussed below, another generic manufacturer – Norwich Pharmaceuticals – litigated essentially the same patent case against Bausch and won.  Norwich filed its ANDA much later than Teva did.  As a result, it did not win in the district court until August 2022 or in the Court of Appeals until April 2024.  Teva would have received similar rulings much earlier.

196.    Further, FDA approval of the ANDAs filed by subsequent generic manufacturers has been bottlenecked behind Teva's 180-day ANDA exclusivity.  Absent the unlawful reverse payments, Teva would have already launched generic Xifaxan 550 mg and its 180-day ANDA exclusivity would have expired.  The market for Xifaxan 550 mg would have been fully genericized by now, and Bausch would have had no reason to block additional entrants.  Plaintiff

and other purchasers of the drug would be paying a fraction of what they currently pay to acquire rifaximin.

**E.    Additional Manufacturers Have Sought to Enter the Market and Have Been Delayed by Bausch and Teva.**

197.    After the announcement of the Bausch-Teva settlement, numerous other generics pursued ANDAs seeking to sell generic Xifaxan.  Three generic manufacturers filed Xifaxan ANDAs in 2019.  Two, Sun and Sandoz, settled with Bausch.  However, the third, Norwich, did not settle.  It litigated the patents to a trial which it largely won, confirming the weakness of the majority of Bausch's patent protection.  As discussed below, however, Norwich remains bottlenecked behind Teva due to the unlawful agreement to delay entry until 2028.

198.    In early 2019, Sun Pharmaceutical Industries Ltd. ("Sun") submitted an ANDA (No. 213042) to the FDA seeking authorization to market a generic version of Xifaxan 200 mg.

199.    By letter dated March 11, 2019, Sun notified Bausch that it had submitted its ANDA with a Paragraph IV certification.  As required, Sun provided a detailed statement of the factual and legal basis supporting its position that the patents listed in the FDA's Orange Book for Xifaxan 200 mg were invalid, unenforceable, and/or would not be infringed by the commercial manufacture, use, or sale of Sun's generic product.

200.    On April 24, 2019, Bausch initiated a patent lawsuit against Sun in the U.S. District Court for the District of Delaware asserting the '620, '199, '206, '542, '644, '781, '452, '231, '275, '196, 949, '904, '968, and '115 patents.

201.    On June 24, 2019, Sun filed its answer, affirmative defenses, and counterclaim to Bausch's complaint, asserting declaratory judgment counterclaims of non-infringement and invalidity as to each asserted patent.

202.    On July 15, 2019, Bausch filed its answer to Sun's counterclaims.

203.    In 2019, Sandoz Inc. ("Sandoz") submitted an ANDA with Paragraph IV certifications to the FDA seeking authorization to market a generic version of Xifaxan 550 mg.

204.    By letter dated September 4, 2019, Sandoz notified Bausch that it had submitted its ANDA with a Paragraph IV certification.  As required, Sandoz provided a detailed statement of the factual and legal basis supporting its position that certain patents listed in the FDA's Orange Book for Xifaxan 550 mg were invalid, unenforceable, and/or would not be infringed by the commercial manufacture, use, or sale of Sandoz's generic product.

205.    On September 30, 2019, Bausch began a patent lawsuit against Sandoz in the U.S. District Court for the District of New Jersey asserting the '620, '199, '206, '542, '275, '644, '781,'196, '569, '949, '904, '452, '231, and '968 patents.

206.    On December 16, 2019, Bausch filed an amended complaint, adding infringement claims relating to the '384 patent, which had issued on October 29, 2019.

207.    On January 15, 2020, Sandoz filed its answer and counterclaim to Bausch's amended complaint, asserting declaratory judgment counterclaims of non-infringement and invalidity as to each asserted patent.

208.    On February 5, 2020, Bausch answered Sandoz's counterclaims.

209.    On May 6, 2020, Bausch announced that it had entered a settlement with Sandoz pursuant to which Sandoz agreed to refrain from selling generic Xifaxan 550 mg until at least January 1, 2028 (or earlier under certain circumstances) provided it had obtained FDA approval of its ANDA by that date.

210.    Of course, at the time of this settlement, Sandoz was well aware of Teva's first-to-file status (and resulting 180-day ANDA exclusivity) and the basic terms of the Bausch-Teva agreement.

211.    In particular, Sandoz was aware of the deterrence clauses in the Bausch/Teva agreement.  As noted above, those clauses had the purpose and effect of discouraging later filers, such as Sandoz, from entering the market before Teva's unlawfully delayed entry date.  Those anticompetitive clauses significantly diminished Sandoz's incentives to continue litigating its patent challenges against Bausch.  Absent the unlawful restraints, Sandoz would have had multiple paths to earlier entry, including (i) by obtaining a final judgment that would have triggered the forfeiture of Teva's exclusivity, (ii) using a section viii statement to carve out any patents for nonessential and/or unapproved uses, or (iii) under a lawful license from Bausch.

212.    Absent the unlawful restraints in the Bausch/Teva agreement, Sandoz's generic Xifaxan 550 mg would already be on the market.

213.    While the Bausch-Sun lawsuit over Sun's 200 mg ANDA was pending, in or about August 2020, Sun submitted a Paragraph IV certification to the FDA seeking authorization to market a generic version of Xifaxan 550 mg.

214.    By letter dated August 10, 2020, Sun sent Bausch a Notice of Paragraph IV certification asserting that the U.S. patents listed in the FDA's Orange Book for Xifaxan 550 mg were invalid, unenforceable, and/or would not be infringed by the commercial manufacture, use, or sale of Sun's generic product.

215.    On September 22, 2020, shortly after Bausch received Sun's Paragraph IV certification regarding Xifaxan 550 mg, and before any lawsuit over the implicated patents was filed, Bausch and Sun entered into an agreement by which Sun agreed to refrain from selling generic Xifaxan 550 mg and 200 mg until at least January 1, 2028 (or earlier under certain circumstances) provided it had obtained FDA approval of its ANDA by that date.

216.    Of course, at the time of this settlement, Sun, like Sandoz, was well aware of Teva's first-to-file status (and resulting 180-day ANDA exclusivity) and the basic terms of the Bausch-Teva agreement.

217.    In particular, Sun was aware of the deterrence clauses in the Bausch/Teva agreement.  Those clauses discouraged Sun from trying to enter the market before Teva's unlawfully delayed entry date.  Absent the unlawful restraints in the Bausch/Teva agreement, Sun would not have settled for a January 2028 licensed entry date – the date that the unlawful restraints caused Sun to accept – but would have had multiple paths to earlier entry, including: (i) by obtaining a final judgment that would have triggered the forfeiture of Teva's exclusivity, (ii) using a section viii statement to carve out any nonessential and/or unapproved uses, or (iii) under a lawful license from Bausch.

218.    Absent the unlawful restraints in the Bausch/Teva agreement, Sun's generic Xifaxan 550 mg would already be on the market.

F.    **Norwich's Invalidation of Bausch's Key Patents.**

219.    In December 2019, Norwich submitted ANDA No. 214369 seeking approval to market generic rifaximin 550 mg for both IBS-D and HE indications and included Paragraph IV certifications to a number of the Orange Book-listed patents.

220.    On December 20, 2019, Norwich submitted ANDA No. 214370 seeking FDA approval to market generic rifaximin 200 mg.  Norwich's 200 mg ANDA (No. 214370) did not include any Paragraph IV certifications.

221.    On February 14, 2020, Norwich notified Bausch that it had submitted an ANDA seeking FDA approval to market generic rifaximin 550 mg with Paragraph IV certifications to certain patents that Bausch had listed in the Orange Book.  As required, Norwich provided Bausch with a detailed statement of the factual and legal basis supporting its position that the

patents were invalid, unenforceable, and/or would not be infringed by the commercial manufacture, use, or sale of Norwich's generic 550 mg product.

222.    On March 26, 2020, Bausch filed suit against Norwich alleging infringement by Norwich of one or more claims of twenty-three Xifaxan patents. *Salix Pharmaceuticals, LTD. et al v. Norwich Pharmaceuticals, Inc.*, No. 20-cv-00430 (D. Del.).

223.    On November 13, 2020, Bausch filed its first amended complaint adding an additional three patents alleged to be infringed by Norwich.

224.    The case against Norwich went to trial in March 2022 based on representative patents for each of the following groups of Bausch's patents: (i) patents claiming methods of treating IBS-D with a dosing regimen based on 1650 mg per day (or 550 mg three times a day) of rifaximin, (ii) patents claiming the beta polymorphic form of rifaximin, and (iii) patents claiming treatment methods related to HE.

225.    The U.S. District Court for the District of Delaware issued a final judgment on August 10, 2022 (the "Norwich Judgment"), finding invalid the representative patents protecting the beta polymorph rifaximin composition and the claims for the methods of using Xifaxan for treating IBS-D based on a 1650 mg per day or three-times-a-day 550 mg dosing regimen. However, it found certain of Bausch's HE patents to be valid and infringed.

226.    Thus, the Norwich Judgment effectively established that Bausch's patents did not provide any exclusivity against generic competition for IBS-D indications.

227.    The district court's findings apply equally to the other claims Bausch had previously asserted but withdrew.  The court found the polymorph claims to be invalid because the prior art taught the preparation and use of crystalline rifaximin and one skilled in the art had good reason to use routine techniques to characterize the crystalline rifaximin produced by the

prior art which would have led to detection of the beta polymorph form claimed and asserted as present in the accused product.  The other polymorphic forms of rifaximin would have similarly been detected by routine characterization of the crystalline rifaximin produced by the prior art, and the other rifaximin polymorph patent claims differed only in minor variations of excipients, hydration levels, or pharmaceutical formulation.  None of these differences would have supported the validity of the patents under the court's obviousness analysis.  Accordingly, the other Polymorph Patent claims likewise would have been found invalid as obvious had they been tried.

228.    Bausch appealed the Norwich Judgment to the U.S. Court of Appeals for the Federal Circuit on August 16, 2022.

229.    On April 11, 2024, the appellate court affirmed the Norwich Judgment.

230.    While the Norwich Judgment invalidated Bausch's representative polymorph and IBS-D indication patents, it found that Bausch's representative patents claiming the use of Xifaxan 550 mg tablets for HE had not been proven to be invalid and were infringed by Norwich's ANDA.

231.    Accordingly, because Norwich's 550 mg ANDA label included both IBS-D and HE treatment indications, the District Court's final judgment enjoined FDA approval of Norwich's 550 mg ANDA until the last expiring HE patent in October 2029.

232.    After the Norwich Judgment, Norwich amended its ANDA to carve out the HE indications from its label via section viii statements.  Norwich then filed a motion in the District Court requesting modification of the final judgment to permit the FDA to approve Norwich's revised ANDA limited to the IBS-D indications.

233.     On May 17, 2023, the District Court denied Norwich's motion to modify the final judgment to allow Norwich to market its 550 mg ANDA product for the IBS-D indications.  The court confirmed that the FDA remains enjoined from granting final approval to Norwich's ANDA until October 2, 2029.  The Court of Appeals for the Federal Circuit affirmed that decision.  Accordingly, Norwich cannot yet market its generic Xifaxan 550 mg even for the IBS-D indications on which it prevailed in the patent case.

234.     Bausch and Teva's unlawful conduct has delayed Norwich's generic Xifaxan 550 mg.  Absent the reverse payment, Teva could have litigated its challenge to conclusion and would have won, just as Norwich did but much earlier.  Because Teva would have received a favorable district court decision well before Norwich's judgment, Norwich would have been apprised of the need to "carve out" the HE indications from its ANDA application and it would have done so from the start.

235.     Alternatively, but for Bausch's unlawful payments to Teva, Teva would have launched by now and Bausch's incentive to keep other generics off the market would have been significantly reduced.

236.     Consequently, Norwich – like Sandoz and Sun – would have been on the market selling generic Xifaxan 550 mg by now.

**G.     Bausch and Teva Have Excluded Amneal From the Market.**

237.     In or about February 2024, Amneal Pharmaceuticals of New York, LLC and Amneal EU, Limited (collectively "Amneal") submitted an ANDA to the FDA seeking approval to market generic Xifaxan 550 mg tablets.  Amneal's ANDA included a Paragraph IV certification that Bausch's listed patents were invalid, unenforceable, and/or would not be infringed by Amneal's proposed ANDA product.  The only indication for which Amneal's

ANDA seeks FDA approval is for the treatment of IBS-D. Accordingly, Amneal filed section viii statements carving out the HE indications.

238.    On February 27, 2024, Amneal sent a Notice of the Paragraph IV certification to Bausch, asserting that the Amneal generic would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it.

239.    At the time of Amneal's notice, Bausch had listed the following patents in the Orange Book as claiming Xifaxan 550 mg or a method of using it:

### *Polymorph Patents*

U.S. Patent No. 8,193,196 ("the '196 patent")

U.S. Patent No. 8,518,949 ("the '949 patent")

U.S. Patent No. 8,741,904 ("the '904 patent")

U.S. Patent No. 9,271,968 ("the '968 patent")

U.S. Patent No. 10,703,763 ("the '763 patent")

### *IBS-D Patents*

U.S. Patent No. 11,779,571 ("the '571 patent")

U.S. Patent No. 11,564,912 ("the '912 patent")

U.S. Patent No. 10,456,384 ("the '384 patent")

240.    On or around April 5, 2024, Bausch filed a patent infringement lawsuit in the District of New Jersey against Amneal, alleging that Amneal's proposed product infringed these patents. Bausch amended its complaint on June 4, 2024.

241.    Bausch's lawsuit against Amneal triggered an automatic 30-month stay of final FDA approval of Amneal's ANDA. The 30-month stay is not set to expire until August 29, 2026.

242.    In listing the Polymorph Patents and the IBS-D Patents in the Orange Book, Bausch asserted that they claim Xifaxan 550 mg or a method of using it, and that Bausch could reasonably assert a claim of patent infringement against anyone who made a generic version of Xifaxan 550 mg without a license from Bausch.  21 U.S.C. § 355(b)(1)(A)(viii).  The Hatch-Waxman Amendments prohibit NDA holders from submitting information on patents that do not meet these criteria.  21 U.S.C. § 355(c)(2) ("Patent information that is not the type of patent information required by subsection (b)(1)(A)(viii) shall not be submitted under this paragraph.").

243.    The FDA does not verify that submitted patents actually meet the statutory listing criteria.  Instead, the FDA's role with respect to the Orange Book patent listings is purely ministerial.  The NDA holder is responsible for determining whether a patent claims the drug or a method of using the drug that is the subject of the NDA and therefore should be listed in the Orange Book.

244.    As detailed below, none of Bausch's unexpired IBS-D or unexpired Polymorph Patents should have been listed in the Orange Book because they did not meet the listing requirements.  However, by wrongfully listing those patents in the Orange Book, Bausch required Amneal and other subsequent filers to file Paragraph IV certifications against them.

245.    Had Amneal not been required to file Paragraph IV certifications against those patents, it would have filed an ANDA that contained only section viii carve outs and non-Paragraph IV certifications.  As a result, it would not have been subject to the 30-month stay nor to Teva's 180-day exclusivity and would have already received FDA final approval.

246.    To the extent Amneal filed Paragraph IV certifications against additional patents such as the '542 patent and the '275 patent, those patents have since expired.

1. **The Polymorph Patents**

247.    Rifaximin exists in five different polymorphic hydrate forms, designated the alpha, beta, gamma, delta, and epsilon forms.  Each of these polymorphs has a unique crystalline form that has a specific water content or range of water content and its own physical and analytical characteristics.

248.    The manufacturing conditions under which rifaximin is created may impact the resulting polymorphic form and thus, in some instances, the compound's properties.

249.    Xifaxan and Amneal's generic drug product contain the alpha polymorph.

250.    All of the unexpired Polymorph Patents claim rifaximin delta and/or epsilon and methods of using those polymorphs.  None of the unexpired Polymorph Patents claims rifaximin alpha or its use.

251.    Bausch was well aware that the unexpired Polymorph Patents did not satisfy the requirements of the Orange Book listing statute.  It nevertheless made a deliberate and knowing decision to wrongfully list them for anticompetitive reasons.

252.    The unexpired Polymorph Patents were not eligible for Orange Book listing because they do not claim Xifaxan or a method of using it.

253.    Moreover, Bausch believed that its delta and epsilon polymorph patents could not reasonably be asserted against generic Xifaxan because the bioequivalence of the delta and epsilon polymorphs to the alpha polymorph could not be established.  Specifically, on October 17, 2016, Bausch filed a Citizen Petition asking the FDA to "refrain from approving any [ANDA] . . . referencing any strength of Xifaxan . . . unless" ANDA filers provide "[c]haracterization studies [that] demonstrate that the Proposed Generic's active ingredient is identical in rifaximin polymorph profile to that of the Xifaxan active ingredient[.]"  In other

words, Bausch requested that no ANDA be approved unless it contained rifaximin polymorph alpha or a polymorph bioequivalent to polymorph alpha.

254.    Importantly, Bausch's rationale in its Citizen Petition for this request was that other polymorphs of rifaximin could not possibly be shown to be bioequivalent to polymorph alpha because it was not technologically possible to do so:

> For many drugs, polymorph form of the active ingredient does not affect potency. For Xifaxan, polymorph form matters, greatly . . . FDA recognizes that, in reviewing an ANDA for approval, it must assess active ingredient "sameness" on a case-by-case basis, and may need to prescribe standards—including specification of crystalline structure—when necessary to ensure sameness. This is one of those cases: Different Polymorph Proposed Generics are expected to have topical and systemic drug potencies different from those of Xifaxan. Thus, such Proposed Generics cannot meet the sameness of active ingredient criterion.
>
> ***Additionally, a Different Polymorph Proposed Generic cannot be demonstrated to have sameness of strength to, or be bioequivalent to, Xifaxan. Testing technology needed to make those demonstrations for an ANDA does not exist.***

255.    To submit this Citizen Petition, Bausch was required to certify the date when "the information upon which [it] ha[s] based the action requested herein first became known to [it]." It certified that at least some of the information upon which it based its request, including the lack of technology to establish bioequivalence between rifaximin polymorphs, predated the listing dates of each unexpired Polymorph Patent:

> Information regarding the point that Different Polymorph Proposed Generics cannot be demonstrated to meet the sameness of active ingredient, sameness of strength or bioequivalence criteria, because testing technology needed to make those demonstrations does not exist (Petition § II.D.2): The following guidance became available to Salix on its dates of initial publication: Draft BA & BE Studies Guidance 2003 (March 19, 2003); Non-Inferiority Draft Guidance (March 1, 2010). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

256.    Though the publicly available version of Bausch's Citizen Petition is heavily redacted, it is clear that Bausch's arguments rely heavily on studies and publications predating the unexpired Polymorph Patent listing dates.

257.    In the *Amneal* litigation, Bausch represented that the delta and epsilon polymorphs have significantly different absorption properties compared to the alpha polymorph. Given the publicly known information about the bioavailability of the different polymorphs in the next paragraph, it is implausible that either delta or epsilon could be bioequivalent to alpha or each other.

258.    Bausch's Citizen Petition includes the following table showing that rifaximin delta and epsilon polymorphs do not come close to satisfying the regulatory requirements to be considered bioequivalent to rifaximin alpha (AUC and Cmax within 80-125% at a 90% confidence interval):

**Table 6:** Study of Bioavailability of the Crystalline Forms of Rifaximin in Dogs. Mean ± S.E.M. of the PK Parameters After Oral Administration of 100 mg kg$^{-1}$ (n=4)[90]

| Rifaximin Form | Cmax$^a$ (ng/mL) | Tmax$^b$ (h) | AUC$_{0-24 h}$$^c$ | AUC$_{0-inf}$$^d$ (ng.h/mL) |
|---|---|---|---|---|
| α | 2.6 ± 0.7 | 4 | 17 ± 7 | 17 ± 7 |
| β | 1.1 ± 0.6 | 4 | 10 ± 7 | 12 ± 8 |
| γ | 1,085.1 ± 78.7 | 2 | 4,795 ± 4,120 | 4,894 ± 4,107 |
| δ | 308.3 ± 224.1 | 2 | 801 ± 517 | 830 ± 515 |
| ε | 6.9 ± 5.1 | 4 | 42 ± 35 | 77 ± 42 |

$^a$ Maximum observed plasma concentration. $^b$Time from administration to obtain C$_{max}$; the values are given as median. $^c$Area under the concentration-time curve from time zero up to last sampling (24 h after administration). $^d$Area under the concentration-time curve calculating the extrapolation to infinity.

259.    Bausch's position necessarily establishes its belief that: (1) no generic using delta- or epsilon-based rifaximin could be proven bioequivalent to the alpha polymorph used in Xifaxan because it was impossible to even test for bioequivalence; and (2) a patent claiming only these polymorphs could not be reasonably asserted in litigation because no generic would seek approval for a formulation that could not meet FDA approval standards.

260.    If a brand believes that a drug substance patent claiming different polymorphs of the approved product could reasonably be asserted in litigation, it must list such patents in the Orange Book and certify on FDA form 3542a that it has conducted testing to confirm the bioequivalence of the listed polymorphs by demonstrating that they perform the "same" as the approved polymorph (*i.e.*, with respect to such characteristics as dissolution, solubility, and bioavailability).  21 C.F.R. § 314.53; 68 Fed. Reg. 36676 at 36677-78.

261.    The sponsor is not required to submit its data, and the certifications are not verified by the FDA.  68 Fed. Reg. at 36679.

262.    In Section 2.2, the form asks, "does the patent claim a drug substance that is a different polymorph of the active ingredient described in the pending NDA, amendment or supplement?"  Section 2.3 of the form continues: "If the answer to question 2.2 is 'Yes,' do you certify that, as of the date of this declaration, you have test data demonstrating that a drug product containing the polymorph will perform the same as the drug product described in the NDA? The type of test data required is described at 21 CFR 314.53(b)."  The sponsor is then required to "[s]pecify the polymorphic form(s) claimed by the patent for which you have the test results described in 2.3."

263.    On the form associated with the '196, '949, and '904 patents, Bausch answered "No" to the Section 2.2 question, a demonstrable lie to the FDA potentially constituting a criminal offense.  *E.g.*:

| Department of Health and Human Services<br>Food and Drug Administration | Form Approved: OMB No. 0910-0513<br>Expiration Date: 10/31/2016<br>*See OMB Statement on Page 3.* |
|---|---|
| **PATENT INFORMATION SUBMITTED WITH THE FILING OF AN NDA, AMENDMENT, OR SUPPLEMENT**<br><br>*For Each Patent That Claims a Drug Substance (Active Ingredient), Drug Product (Formulation and Composition) and/or Method of Use* | NDA NUMBER<br>021361<br><br>NAME OF APPLICANT/NDA HOLDER<br>Salix Pharmaceuticals, Inc. |

| *The following is provided in accordance with Section 505(b) and (c) of the Federal Food, Drug, and Cosmetic Act.* |
|---|

TRADE NAME (OR PROPOSED TRADE NAME)

XIFAXAN ®

| ACTIVE INGREDIENT(S) | STRENGTH(S) |
|---|---|
| Rifaximin | 550mg |

DOSAGE FORM

Tablet

This patent declaration form is required to be submitted to the Food and Drug Administration (FDA) with an NDA application, amendment, or supplement as required by 21 CFR 314.53 at the address provided in 21 CFR 314.53(d)(4). Within thirty (30) days after approval of an NDA or supplement, or within thirty (30) days of issuance of a new patent, a new patent declaration must be submitted pursuant to 21 CFR 314.53(c)(2)(ii) with all of the required information based on the approved NDA or supplement. The information submitted in the declaration form submitted upon or after approval will be the *only* information relied upon by FDA for listing a patent in the Orange Book.

**For hand-written or typewriter versions (only) of this report:** If additional space is required for any narrative answer (i.e., one that does not require a "Yes" or "No" response), please attach an additional page referencing the question number.

*FDA will not list patent information if you submit an incomplete patent declaration or the patent declaration indicates the patent is not eligible for listing.*

*For each patent submitted for the pending NDA, amendment, or supplement referenced above, you must submit all the information described below. If you are not submitting any patents for this pending NDA, amendment, or supplement, complete above section and sections 5 and 6.*

| **1. GENERAL** | | |
|---|---|---|
| a. United States Patent Number<br>8,193,196 | b. Issue Date of Patent<br>5 June 2012 | c. Expiration Date of Patent<br>2 September 2027 |
| d. Name of Patent Owner<br>ALFA WASSERMANN S.p.A. | Address *(of Patent Owner)*<br>1, VIA ENRICO FERMI | |
| | City/State<br>ALANNNO (PE), ITALY 65020 | |
| | ZIP Code<br>1-65020 | FAX Number *(if available)*<br>+39-051 388593 |
| | Telephone Number<br>+39-051 6489511 | E-Mail Address *(if available)* |

e. Name of agent or representative who resides or maintains | Address *(of agent or representative named in 1.e.)*

| 2. Drug Substance (Active Ingredient) | | |
|---|---|---|
| 2.1 Does the patent claim the drug substance that is the active ingredient in the drug product described in the pending NDA, amendment, or supplement? | ☒ Yes | ☐ No |
| 2.2 Does the patent claim a drug substance that is a different polymorph of the active ingredient described in the pending NDA, amendment, or supplement? | ☐ Yes | ☒ No |
| 2.3 If the answer to question 2.2 is "Yes," do you certify that, as of the date of this declaration, you have test data demonstrating that a drug product containing the polymorph will perform the same as the drug product described in the NDA? The type of test data required is described at 21 CFR 314.53(b). | ☐ Yes | ☐ No |
| 2.4 Specify the polymorphic form(s) claimed by the patent for which you have the test results described in 2.3. | | |

| 6. Declaration Certification | |
|---|---|
| 6.1 *The undersigned declares that this is an accurate and complete submission of patent information for the NDA, amendment, or supplement pending under section 505 of the Federal Food, Drug, and Cosmetic Act. This time-sensitive patent information is submitted pursuant to 21 CFR 314.53. I attest that I am familiar with 21 CFR 314.53 and this submission complies with the requirements of the regulation. I verify under penalty of perjury that the foregoing is true and correct.* <br><br> *Warning: A willfully and knowingly false statement is a criminal offense under 18 U.S.C. 1001.* | |
| 6.2 Authorized Signature of NDA Applicant/Holder or Patent Owner (Attorney, Agent, Representative or other Authorized Official) (Provide Information below) <br><br> *Nail Sloft* | Date Signed <br><br> 01 August 2014 |

Form FDA 3542a for U.S. Patent No. 8,193,196

264.    Based on Bausch's representations, the FDA listed the '196, '949, and '904 Patents in the Orange Book (a ministerial act) and Bausch used them to obtain improper 30-month stays and to bottleneck Amneal and others behind Teva's Paragraph IV certifications.

265.    Had Bausch been honest and answered "yes" to the Section 2.2. question, it would have had to certify that it had data to demonstrate that delta and/or epsilon rifaximin polymorphs were bioequivalent to rifaximin polymorph alpha.  Absent such a certification, the FDA would not have listed the patents.  As demonstrated above, Bausch believed it was impossible to marshal such evidence and represented as much to the FDA.

266.    The '763 Patent was also improperly listed pursuant to the FDA's "Use Code" regulations.

267.    When a brand lists a method of use patent such as the '763 patent, it must describe the use in its Form 3542a before it can be published in the Orange Book.  The Use Code must contain a "description of the patented method of use as required for publication, which must contain adequate information to assist 505(b)(2) and ANDA applicants in determining whether a listed method-of-use patent claims a use for which the 505(b)(2) or ANDA applicant is not seeking approval."  21 C.F.R. § 314.53(c)(2)(ii)(P)(3).

268.    The purpose of such publication is to put potential ANDA filers on notice of the claimed use to give them the option of excluding it by filing a section viii carve out.  The FDA codified this requirement to "address overbroad or ambiguous use codes" and "to assist FDA and 505(b)(2) and ANDA applicants in determining whether a listed method-of-use patent claims a use for which the 505(b)(2) or ANDA applicant is not seeking approval."  The codification expressly requires "that if the method(s) of use claimed by the patent does not cover an indication or other approved condition of use in its entirety, the NDA holder's use code must describe only the specific approved method of use claimed by the patent for which a claim of patent infringement could reasonably be asserted if a person not licensed by the patent owner engaged in the manufacture, use, or sale of the drug product."  81 Fed. Reg. 69580 at 581.

269.    The FDA takes the sponsor's listed code as a given.  It does not independently assess the patent's scope or otherwise look behind the description provided by the brand.  In other words, the FDA's role with respect to patent listing, including Use Codes, is purely ministerial.

270.    Thus, whether a generic manufacturer may use a section viii carve out to avoid infringement of a method-of-use patent depends entirely on how the brand describes its patent, and whether it faithfully follows the rules for Orange Book listings and Use Codes.

271.    In its Form 3542a for the '763 Patent, Bausch identified claim numbers 1, 2, and 5 as claiming an approved method of using Xifaxan.  Independent claim 1 recites:

> A method of treating bacterial activity in the gastrointestinal tract of a subject, the method comprising:
>
> orally administering to the subject a pharmaceutical composition comprising a therapeutically effective amount of rifaximin δ [(delta)] together with a pharmaceutically acceptable excipient selected from the group consisting of diluting, binding, lubricating, disintegrating, colouring, flavouring and sweetening agents, wherein rifaximin δ [(delta)] has a powder X-ray diffractogram showing peaks at values of the diffraction angles $2\theta$ of about $5.7°\pm0.2$, $6.7°\pm0.2$, $7.1°\pm0.2$, $8.0°\pm0.2$, $8.7°\pm0.2$, $10.4°\pm0.2$, $10.8°\pm0.2$, $11.3°\pm0.2$, $12.1°\pm0.2$, $17.0°\pm0.2$, $17.3°\pm0.2$, $17.5°\pm0.2$, $18.5°\pm0.2$, $18.8°\pm0.2$, $19.1°\pm0.2$, $21.0°\pm0.2$, $21.5°\pm0.2$.

272.    Dependent claim 2 recites:

> The method of claim 1, wherein the pharmaceutical composition is in a formulation selected from the group consisting of coated or uncoated tablet, hard or soft gelatin capsule, sugar-coated pill, lozenge, wafer sheet, pellet, and powder in sealed packet.

273.    Dependent claim 5 recites:

> The method of claim 1, wherein rifaximin δ [(delta)] has a water content between 3.0% and 4.5%.

274.    The Use Codes submitted for the '763 Patent are much broader than these claims. They identify the uses of the '763 patent as "Reduction in risk of overt hepatic encephalopathy (HE) recurrence in adults" and "Treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults."  Neither use is limited to the specific polymorph claimed in the '763 patent as therapeutically effective.

275.    But 21 C.F.R. § 314.53(b)(1) requires the Use Code to describe the "method of use," not just the indication.  By failing to limit the Use Code to methods of using the delta polymorph of rifaximin, Bausch was able to bottleneck generics behind the '763 Patent, which claims methods of using a polymorph that Bausch itself argued could not even be approved as the active ingredient in a generic form of Xifaxan.

276.    21 C.F.R. § 314.53(b)(1) further requires that "[f]or approved NDAs, the NDA holder's description of the patented method of use . . . describe only the approved method(s) of use claimed by the patent for which a claim of patent infringement could reasonably be asserted."  The '763 patent could not reasonably be believed to cover Xifaxan, which uses rifaximin alpha.  It should not have been listed in the Orange Book.

277.    The overbroad Use Code denied generics like Amneal the opportunity to carve out the claimed use of rifaximin delta and to sell generic Xifaxan manufactured using rifaximin alpha, as Bausch's submissions to FDA argued should have been required.

278.    As a result, Amneal was required to file a Paragraph IV certification against the '763 patent even though its ANDA product contains only rifaximin alpha.  Generics like Amneal would not have been required to file Paragraph IV certifications against the '763 patent had Bausch accurately described these uses in the Orange Book.

### 2.    The IBS-D Patents

279.    In addition to improperly listing the Polymorph Patents, Bausch improperly listed the unexpired IBS-D Patents in the Orange Book.  As a result, manufacturers of generic Xifaxan had to file Paragraph IV certifications that should not have been necessary.  Absent those certifications, Amneal and other generics would not have been subject to either a 30-month stay or Teva's 180-day exclusivity.

280.    Bausch obtained the unexpired IBS-D Patents starting with the '569 patent by defrauding the PTO. Dr. William Forbes, a named inventor and a high-ranking executive in charge of research and development at Bausch, withheld material information from the PTO. Had Dr. Forbes disclosed the withheld information, including evidence of prior art uses of rifaximin to treat IBS, a reasonable examiner would not have allowed the patents to issue. The only plausible reason for the failure of Dr. Forbes (or any other individual substantively involved in the prosecution of the '569 patent and its descendants) to disclose the withheld information was an intent to deceive the PTO examiner into issuing the patents. This fraud on the PTO caused significant injury, in part because absent the fraud neither the '569 patent nor its descendants would have issued, been listed, or been the subject of patent litigation. Thus, absent the fraud, those patents would not have been a barrier to competition.

281.    The '569 patent claims:

> 1. A method of providing acute treatment for diarrhea-associated Irritable Bowel Syndrome (dIBS) comprising: administering 1650 mg/day of rifaximin for 14 days to a subject in need thereof, wherein removing the subject from treatment after the 14 days results in a durability of response, wherein the durability of response comprises about 12 weeks of adequate relief of symptoms.
>
> 2. The method of claim 1, wherein the 1650 mg is administered as 550 mg three times per day.

282.    Dr. Forbes knew that these inventions were (1) in the public domain; (2) on sale; and/or (3) otherwise disclosed in the prior art. Dr. Forbes nevertheless withheld this material information from the PTO in violation of his duty of candor with the intent to deceive the PTO into issuing the '569 patent.

283.    The application that issued as the '569 patent was filed on February 26, 2009, and the earliest claimed effective filing date for the patent was February 26, 2008 based on a provisional application filed on that date.

284.    In the *Norwich* case, the district court and the Federal Circuit Court of Appeals agreed that there was "widespread" use of Xifaxan to treat IBS-D by the public before that date.

285.    These public uses were well known to Bausch generally and Forbes specifically. Bausch and Forbes had encouraged such use years before the filing date of the '569 patent.

286.    The public uses and on sale activities were material information that rendered the claims of the '569 patent unpatentable under 35 U.S.C. § 102(a) and (b).

287.    In separate *qui tam* suits, multiple relators alleged that a central aspect of Bausch's business model dating back to Xifaxan's approval was to promote Xifaxan off-label for IBS-D.  This practice was not disclosed to the examiner.

288.    In November 2005, more than two years before the earliest possible effective filing date for the '569 Patent, Forbes hosted an analyst call with Dr. Mark Pimentel, a prominent gastroenterologist, Bausch consultant, and licensor of certain Xifaxan patents.

289.    On that call, Pimentel disclosed that at his practice at Cedars-Sinai Hospital in California, he and his colleagues had treated approximately 900 patients with Xifaxan and had seen the "most dramatic improvements in IBS" compared to other antibiotics.

290.    Pimentel further stated that, in addition to the 900 uses in his practice, "nearly 50% of [gastroenterologists] on the West Coast are in tune with this already and perhaps more, and across the U.S. it's advancing very rapidly."

291.    Pimentel further stated that he was dosing IBS patients with 1,200 mg/day of Xifaxan, very close to and just below the claimed dose in the '569 patent.

292.    The analyst call was not disclosed to the examiner.

293.    Bausch conducted independent market research that confirmed widespread physician adoption of Xifaxan for IBS as early as 2005.

294.    This market research was not disclosed to the examiner.

295.    On February 25, 2006, more than two years before the earliest possible effective filing date for the '569 patent, Leonard Weinstock, M.D., a gastroenterologist who had received honoraria from Bausch and whose research had been funded by Bausch, emailed Forbes regarding one of his patients.

296.    In that email, Weinstock reported a "90% global sx response [sic] with 1800 mg Xifaxan/day x 14 days," very close to and just above the claimed dose in the '569 patent.

297.    In deposition testimony presented at the *Norwich* trial, Forbes did not contest that the Weinstock email referred to treating IBS.

298.    The Weinstock email was not disclosed to the examiner.

299.    Had Forbes disclosed the prior art public uses of both 1,200 mg rifaximin and 1,800 mg rifaximin to treat IBS successfully, a reasonable examiner would never have allowed claim 1 of the '569 patent for a dose of 1,650 mg of rifaximin.  Forbes was personally in possession of that information yet never disclosed it to the examiner.

300.    In 2011, before the '569 patent issued, Weinstock conducted a retrospective chart review of patients treated with doses of 800–1800 mg/day of rifaximin for 10–14 days between 2005 and 2011.

301.    That analysis, Weinstock, LB, *Long-Term Outcome of Rifaximin Therapy in Non-Constipation Irritable Bowel Syndrome*, Digestive Diseases and Sciences, Sept. 2011 ("Weinstock 2011"), reported that "74% [of patients] had an adequate response."

302.    The specific chart data underlying Weinstock 2011 confirms that Weinstock treated multiple patients with up to 1,800 mg/day of rifaximin for 10–14 days and obtained durable results more than a year before February 28, 2008.

303.    While Weinstock 2011 was not itself prior art, much of the data underpinning Weinstock 2011 was prior art that was not disclosed to the examiner.

304.    Forbes had a longstanding relationship with Weinstock.

305.    The Weinstock email shows that Forbes and Weinstock were in contact about treating IBS-D with Xifaxan.

306.    In addition, Forbes and Weinstock co-authored at least two articles, including at least one during prosecution of the '569 patent.

307.    Weinstock served on the Salix speakers' bureau.

308.    Multiple Weinstock publications acknowledge financial and other support from Salix.  For example, Weinstock 2011 discloses that "Leonard B. Weinstock is on the Salix Pharmaceuticals speakers' bureau. Funding for this study was received from Salix Pharmaceuticals, Inc. Editorial assistance was provided under the direction of Leonard B. Weinstock by MedThink Communications with support from Salix Pharmaceuticals, Inc."

309.    Other Weinstock publications contain similar disclosures.

310.    On December 1, 2011, the examiner rejected Bausch's '569 claims as obvious over Viscomi, U.S. patent application US 2005/0272754 (in combination with other prior art).

311.    The examiner found that Viscomi taught rifaximin for IBS and disclosed dosages of 100-1800 mg/day with wide regimen variation over days to months.

312.    The examiner concluded that, with Viscomi's guidelines, a skilled gastroenterologist would be motivated to seek an optimal dosage range/regimen through no more than routine experimentation.

313.    The examiner concluded that "it is not inventive to discover the optimal dose, or regimen, by routine experimentation when general conditions of a claim are disclosed in prior art."

314.    On May 12, 2012, Bausch's attorneys told the examiner that Alfa Wasserman, which employed Viscomi and had rights to the Viscomi patent, and Salix were parties to a Joint Research Agreement ("JRA").  Salix argued that Viscomi was therefore not prior art under 35 U.S.C. § 103's Joint Research Exception.

315.    The examiner subsequently withdrew the rejection based on Viscomi in view of Bausch's statements.  Had Forbes disclosed the successful prior art uses of rifaximin at 1,200 mg and 1,800 mg known to him for treating IBS, the examiner would not have withdrawn the objection because the prior art public uses withheld by Forbes involved the very subject matter the examiner had relied upon in rejecting the claims based on Viscomi.  It was inconsistent with the duty of candor that Forbes owed to the PTO to argue that Viscomi was not prior art while at the same time withholding evidence of prior art uses equivalent to the teachings of Viscomi that the examiner had relied upon.

316.    The '569 patent issued on November 13, 2012.

317.    Bausch's successful argument with respect to Viscomi US 2005/0272754 misled the examiner into believing it was exempted as prior art under the Joint Research Exception. However, Bausch knew that Viscomi US2005/0272754 was published more than one year prior to the earliest priority date for the '569 patent, and therefore Viscomi US2005/0272754 qualified

73

as printed publication prior art to the '569 patent under 35 U.S.C. § 102(b).  The Joint Research Exception does not apply to printed publications which qualify as prior art under 35 U.S.C. § 102(b) and as such Viscomi US2005/0272754 was not entitled to the Joint Research Exception.

318.    The Joint Research Exception that Bausch relied on also does not apply to foreign patent applications and publications.

319.    Foreign family members of Viscomi, for example European Patent Publication EP1676847A1, disclosed medicinal preparations of rifaximin and a dosage range encompassing 1,650 mg/day and the 1,800 mg per day disclosed in Viscomi.

320.    Such foreign family members of Viscomi and other prior art publications would have been material to the Examiner's consideration of the claims, without being excludable under the Joint Research Exception.

321.    Foreign family members of Viscomi, including EP1676847A1, were not disclosed to the examiner.

322.    Additionally, on information and belief, other publications of the same or similar material information occurred at or around this same time and were known to those having a duty of candor to the PTO during the prosecution of the '569 patent and were also not disclosed to the examiner.

323.    Bausch similarly failed to disclose its own public uses, known public uses by others, and material publications such as those relating to Viscomi *et al.* in the related applications to the '569 patent which issued as the remaining unexpired IBS-D Patents.  Each of these failures to disclose was an independent act of fraud on the PTO, which renders those patents invalid and/or unenforceable for the same reasons.

324. All the remaining unexpired IBS-D Patents descend from the patent application that led to the '569 patent.

325. For example, the 384 and '667 patents Bausch listed in the Orange Book descended from U.S. Patent Nos. 7,566,270 and 9,931,325, which themselves descended from the '569 Patent. Bausch never listed the '270 and '325 patents in the Orange Book. Accordingly, Bausch concluded that they did not cover any approved use of Xifaxan.

326. As a result, no ANDA filer was ever required to submit a Paragraph IV certification against the '270 or '325 Patents.

327. Bausch filed the applications that lead to the '384 and '667 patents on February 22, 2018, and January 9, 2020, respectively, after its settlement with first filer Teva.

328. The PTO rejected both applications as obvious in view of the unlisted '270 and '325 patents.

329. Rather than attempt to show the '384 and '667 patents were patentably distinct from the unlisted '270 and '325 patents, Bausch filed terminal disclaimers.

330. A patentee uses a terminal disclaimer to overcome certain rejections such as a non-statutory double patenting rejection.

331. When the PTO issues a patent subject to a terminal disclaimer, that patent expires no later than the earlier expiring patent over which it has been disclaimed and the two patents must remain in common ownership.

332. The PTO issued the '384 patent on October 29, 2019, and the '667 patent on September 8, 2020.

333. Bausch's listing of the '384 and '667 Patents required ANDA filers subsequent to Teva to submit otherwise unnecessary Paragraph IV certifications.

334.    Bausch listed the '571 and '912 patents in the Orange Book shortly after the *Norwich* court invalidated the related '667 and '569 patents.

335.    The claims invalidated in *Norwich* involved using rifaximin to treat IBS-D, including claims directed to subjects 65 years of age or older.

336.    The '571 and '912 patents are also directed to treating IBS-D "in a female subject." As subjects 65 years or older (as claimed in the '667 and '569 patents) necessarily include female subjects, the '571 and '912 patents are subject to, and invalidated by, the same prior art that invalidated the '667 and '569 patents. In other words, Bausch listed the '571 and '912 patents in the Orange Book even though those patents are substantively the same as those that had just been invalidated.

337.    Accordingly, Bausch had no basis to attest that the '571 and '912 patents "could reasonably be asserted" in patent litigation against unlicensed generic manufacturers.

338.    Listing the '571 and '912 patents nonetheless compelled generic applicants like Amneal to file Paragraph IV certifications, subjected them to a 30-month stay, and bottlenecked them behind Teva's 180-day exclusivity.

339.    Amneal received tentative FDA approval of its ANDA on January 16, 2025. The approval was tentative rather than final due to the pending 30-month stay and Teva's unexpired exclusivity. But for Bausch and Teva's unlawful conduct, Amneal would have received final approval in January 2025 and its generic version of Xifaxan would be on the market today.

### H.    Bausch and Teva Have Excluded Zydus From the Market.

340.    In or about August 2024, Zydus Pharmaceuticals (USA) Inc. ("Zydus") submitted an ANDA to the FDA, seeking approval for its rifaximin 550 mg tablets. Zydus's ANDA included a Paragraph IV certification asserting that Bausch's listed patents were invalid,

unenforceable, and/or would not be infringed by Zydus's proposed generic product. The only indication for which Zydus seeks FDA approval is the treatment of IBS-D.

341.    On or about August 15, 2024, Zydus sent a Notice of the Paragraph IV certification to Bausch, asserting that the Zydus generic would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using Xifaxan 550 mg.

342.    At the time of Zydus's notice, Bausch had listed in the Orange Book the Polymorph Patents (as defined above) and the IBS-D Patents (as defined above).

343.    On September 27, 2024, Bausch sued Zydus on those patents in the District of New Jersey. Bausch alleged that each of the Polymorph Patents and IBS-D Patents is valid and infringed.

344.    Bausch's lawsuit triggered an automatic 30-month stay of FDA's approval of Zydus's ANDA until March 2027

345.    Bausch and Zydus subsequently negotiated a settlement and license agreement and, on August 19, 2025, the Court entered a stipulation dismissing Bausch's patent infringement claims.

346.    Zydus is bottlenecked by Teva's unexpired exclusivity.

**I.    Bausch and Teva Have Excluded Cipla and Carnegie From the Market.**

347.    In or about August 2024, Cipla USA, Inc. and Cipla Limited (collectively "Cipla"), submitted an ANDA (No. 219570) to the FDA seeking FDA approval for its rifaximin 550 mg tablets.

348.    Cipla's ANDA includes a Paragraph IV certification that Bausch's relevant patents are invalid, unenforceable, and/or would not be infringed by Cipla's proposed generic product. Cipla's ANDA seeks FDA approval for the treatment of IBS-D.

349.    On or about September 18, 2024, Cipla sent to Bausch notice of its Paragraph IV certification and a detailed statement as to why a Cipla generic would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book for Xifaxan 550 mg or a method of using it.

350.    On November 1, 2024, Bausch filed a patent infringement lawsuit against Cipla in the District of New Jersey alleging that Cipla's ANDA product would infringe the '571, '912, '384, '196, '949, '904, '968, and '763 patents.

351.    Cipla is blocked from the market by Teva's unexpired exclusivity and the 30-month stay triggered by Bausch's patent lawsuit.  But for Bausch's unlawful payments to Teva, neither obstacle would exist.  Absent Bausch and Teva's unlawful conduct, Cipla's ANDA would have been approved earlier and Cipla would be able to enter the market.

352.    In or about September 2024, Carnegie Pharmaceuticals LLC and Carnegie Pharma Limited (collectively "Carnegie") submitted an ANDA (No. 219892) to the FDA seeking FDA approval for its rifaximin 550 mg tablets.

353.    Carnegie's ANDA includes a Paragraph IV certification that Bausch's relevant patents are invalid, unenforceable, and/or would not be infringed by Carnegie's proposed generic product.  Carnegie's ANDA seeks FDA approval for the treatment of IBS-D.

354.    On or about October 1, 2024, Carnegie sent to Bausch notice of its Paragraph IV certification and a detailed statement asserting that the Carnegie ANDA Product would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it.

355.     On November 7, 2024, Bausch filed a patent infringement lawsuit against Carnegie in the District of New Jersey alleging that the Carnegie ANDA product would infringe the '571, '912, '384, '196, '949, '904, '968, and '763 patents.

356.     Bausch and Carnegie subsequently entered into a settlement and license agreement, and on June 23, 2025, the Court entered a stipulation dismissing Bausch's patent infringement claims.

357.     Carnegie is blocked from launching generic Xifaxan 550 mg by Teva's unexpired exclusivity.  Absent Bausch and Teva's unlawful conduct, Carnegie's ANDA would be approved earlier and Carnegie would be able to enter the market.

**J.      Bausch and Teva Have Excluded Saba From the Market**

358.     In February 2025, Saba Ilac Sanayi ve Ticaret A.S. ("Saba") submitted an ANDA to the FDA seeking approval to market its rifaximin 550 mg product in the United States.

359.     Saba's ANDA includes a Paragraph IV certification that Bausch's relevant patents are invalid, unenforceable, and would not be infringed by Saba's generic rifaximin product. Saba's ANDA seeks FDA approval for the treatment of IBS-D.

360.     On or about February 20, 2025, Saba sent to Bausch notice of its Paragraph IV certification and a detailed statement asserting that the Saba product would not infringe any valid and enforceable claim of the various patents that Bausch listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it, specifically including the '571, '912, '196 and '115 patents.

361.     On April 4, 2025, Bausch filed a patent infringement lawsuit against Saba in the District of New Jersey alleging that Saba's ANDA product would infringe the '571, '912, '196 and '115 patents.

362.    Bausch and Saba subsequently negotiated a settlement and license agreement, and on August 21, 2025, the parties filed a stipulation of dismissal as to Bausch's patent infringement claims.

363.    Saba's ANDA remains bottlenecked behind Teva.

**K.    Bausch and Teva Have Excluded Alkem From the Market.**

364.    In or about April 2025, Alkem Laboratories Ltd. ("Alkem") submitted an ANDA to the FDA seeking approval to market its rifaximin 550 mg tablet product.

365.    Alkem's ANDA includes a Paragraph IV certification that Bausch's relevant patents are invalid, unenforceable, and would not be infringed by Alkem's generic product. Alkem's ANDA seeks approval for the treatment of IBS-D.

366.    On or about April 28, 2025, Alkem sent to Bausch notice of its Paragraph IV certification and a detailed statement asserting that Alkem's generic product would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it, specifically including the '571, '912, and '196 patents.

367.    On June 10, 2025, Bausch filed a patent infringement lawsuit against Alkem in the District of New Jersey alleging that Alkem's product would infringe the '571, '912, and '196 patents.

368.    Bausch and Alkem subsequently negotiated a settlement and license agreement, and on August 14, 2025, the parties filed a stipulation of dismissal as to Bausch's patent infringement claims.

369.    Alkem's ANDA remains bottlenecked behind Teva.

## VI.     MARKET POWER AND RELEVANT MARKET

370.     At all relevant times, Bausch has had monopoly power in the market for Xifaxan and its AB-rated generic equivalents (of which there are none) because it had the power to profitably maintain the price of rifaximin at supracompetitive levels.

371.     At all relevant times, a small but significant, non-transitory increase in the price of brand Xifaxan would not have caused a loss of sales that would have made the price increase unprofitable.

372.     Xifaxan does not exhibit significant, positive cross-elasticity of demand with respect to price with any drug other than AB-rated generic versions of Xifaxan.

373.     Xifaxan is differentiated from all drugs other than AB-rated generic versions of Xifaxan.

374.     Bausch needed to control only branded Xifaxan and its AB-rated generic equivalents, and no other products, in order to maintain the price of rifaximin profitably at supracompetitive prices.

375.     Bausch sold brand Xifaxan at prices well in excess of its marginal cost and in excess of the competitive price.  As a result, it had extremely high profit margins.

376.     Bausch had, and exercised, the power to exclude generic competition to branded Xifaxan.

377.     At all material times, high barriers to entry, including regulatory barriers and high costs of entry and expansion, protected brand Xifaxan from the forces of price competition.

378.     There is direct evidence of Bausch's monopoly power with respect to Xifaxan. That evidence includes, among other things, the ratio of the price of Xifaxan to its marginal cost; the margins earned by Bausch on the sale of Xifaxan; and the size and existence of the reverse payment from Bausch to Teva.  As the Supreme Court recognized in *Actavis*, firms lacking

market power are not likely to pay a competitor a large sum to avoid the risk of competition.  570 U.S. 136, 157 (2013).

379.    To the extent proof of monopoly power by defining a relevant product market is required, the relevant antitrust product market is the market for Xifaxan and its AB-rated generic equivalents and the relevant geographic market is the United States.

380.    Bausch's share of the relevant market has been 100% since launching Xifaxan.

## VII.    MARKET EFFECTS

381.    Defendants' conspiracy has had the purpose and effect of restraining competition in the relevant market, allowing Bausch to maintain and extend its monopoly over rifaximin and avoid AB-rated generic competition until January 1, 2028.  It will also allow Teva to enjoy a monopoly over sales of generic Xifaxan starting on January 1, 2028.

## VIII.   ANTITRUST IMPACT

382.    During the relevant time period, Plaintiff's assignors purchased substantial quantities of Xifaxan directly from Bausch.  As a result of Defendants' illegal conduct, the entry of a generic version of Xifaxan will be delayed until January 2028 and the price of generic Xifaxan when it ultimately becomes available will be higher than it would have been absent the violation.  As a result, Plaintiff and its assignors have been compelled to pay artificially inflated prices for branded Xifaxan and will be compelled to pay artificially inflated prices for generic Xifaxan when it finally becomes available in 2028.

383.    Defendants' unlawful conduct and its anticompetitive effects continue through the present day.  Defendants' violations threaten continuing loss and damage to Plaintiff if not enjoined.

## IX.    CLAIMS FOR RELIEF

### COUNT ONE – VIOLATION OF 15 U.S.C. § 1
### (AGAINST ALL DEFENDANTS)

384.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through [383] above as though fully set forth herein.

385.    Bausch has possessed monopoly power in the relevant market from the launch of Xifaxan through the present.

386.    In or about September 2018, Bausch and Teva entered into an unlawful reverse-payment agreement whereby Bausch made large and unjustified payments to Teva in exchange for Teva's agreement to delay the sale of generic Xifaxan until January 1, 2028.  That payment included Bausch's implicit agreement not to launch an authorized generic to compete with Teva's ANDA product and provisions that discouraged subsequent filers from trying to beat Teva to the market.  The purpose and effect of the agreement were: (i) to delay the entry of generic Xifaxan and allow Bausch to maintain and extend its monopoly in the relevant market until January 2028, to the detriment of Plaintiff and other purchasers of the drug; and (ii) to induce Teva to accept a later entry date by effectively granting Teva a monopoly over the sale of generic Xifaxan for at least six months after January 2028, also to the detriment of Plaintiff and other purchasers of the drug.

387.    Defendants' unlawful agreement has had a substantially adverse effect on competition within the relevant market.

388.    There is and was no legitimate, non-pretextual, procompetitive business justification for this reverse payment agreement that outweighs its harmful effect on direct purchasers and competition.  Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve such a purpose.

389.    In the alternative, the agreement between Bausch and Teva was an illegal temporal horizontal market-allocation agreement, a per se violation of section one of the Sherman Act.  Teva agreed not to compete with Bausch by introducing generic Xifaxan from 2018 until January 1, 2028, and Bausch agreed not to compete with Teva by introducing its own Xifaxan authorized generic from January 1, 2028 until six months after Teva's entry.

390.    During the relevant period, Plaintiff's assignors purchased substantial quantities of Xifaxan directly from Bausch.  As a result of Bausch's illegal conduct, Plaintiff and its assignors have been compelled to pay, and continue to pay, inflated prices for Xifaxan.  Plaintiff and its assignors will also pay inflated prices for generic Xifaxan when it becomes available.

391.    Plaintiff and its assignors have been injured in their business or property by Defendants' antitrust violation.  That injury consists of paying higher prices for brand (and generic) Xifaxan than they would have paid absent Defendants' antitrust violations.  Plaintiff's injury is the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

392.    Absent injunctive relief, Plaintiff and its assignors will continue to pay artificially inflated prices for rifaximin for many years into the future.

### COUNT TWO – VIOLATION OF 15 U.S.C. § 2 (MONOPOLIZATION) (AGAINST BAUSCH)

393.    Plaintiff incorporates by reference the allegations in paragraphs 1 through [383] above as though fully set forth herein.  This claim is asserted against Bausch only.

394.    Bausch has possessed monopoly power in the relevant market from the launch of Xifaxan through the present.

395.    Bausch has unlawfully maintained its monopoly power by, *inter alia*, (a) entering into a reverse-payment agreement with Teva that included large and unjustified payments in

exchange for Teva's agreement to delay the launch of generic Xifaxan until January 1, 2028; (b) improperly listing various patents in the Orange Book, thereby subjecting putative generic Xifaxan competitors to regulatory barriers to the entry of generic Xifaxan that otherwise would not have existed; (c) enforcing patents that had been obtained by fraud on the PTO, absent which those patents would not have issued; and (d) knowingly providing false information to the FDA in order to create regulatory barriers to the entry of generic Xifaxan that otherwise would not have existed. As a result of Bausch's misconduct, generic Xifaxan is not likely to be available until January 1, 2028 and Teva is likely to be the only generic competitor on the market for at least six months after January 1, 2028. Plaintiffs and other purchasers of the drug will pay monopoly prices for years to come.

396.    The goal, purpose, and effect of Bausch's unlawful conduct were to maintain and extend Bausch's monopoly power in the relevant market. The delay in the introduction of generic Xifaxan will allow Bausch to continue charging supracompetitive prices and earning supracompetitive profits until full generic competition reaches the market, which will likely not occur until at least 2028. Because the payment to Teva includes the grant of a monopoly on sales of generic Xifaxan, Teva will be able to maintain supracompetitive prices of generic Xifaxan even after its belated entry into the market in January 2028, creating further harm to the market and to Plaintiff and other purchasers of the drug.

397.    During the relevant period, Plaintiff's assignors purchased substantial quantities of Xifaxan directly from Bausch. As a result of Bausch's illegal conduct, Plaintiff and its assignors have been compelled to pay, and continue to pay, inflated prices for Xifaxan. Plaintiff and its assignors will also pay inflated prices for generic Xifaxan when it becomes available.

398.    The anticompetitive consequences of Bausch's actions far outweigh any arguable procompetitive benefits.

399.    Plaintiff and its assignors have been injured in their business or property by Bausch's antitrust violation. That injury consists of paying higher prices for branded (and generic) Xifaxan than they would have paid absent the antitrust violations. Plaintiff's injury is injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

400.    Absent injunctive relief, Plaintiff and its assignors will continue to pay artificially inflated prices for rifaximin for many years into the future.

## X.    DEMAND FOR JUDGMENT

WHEREFORE, with respect to Count One, Plaintiff seeks judgment against all Defendants, jointly and severally, and with respect to Count Two, Plaintiff seeks judgment against Bausch, and with respect to each Count Plaintiff requests the following relief:

A.    An award of Plaintiff's overcharge damages in an amount to be determined at trial, trebled as provided by law;

B.    Permanent injunctive relief prohibiting Defendants from continuing their unlawful conduct and requiring them to take affirmative steps to remedy the continuing adverse effects of their prior conduct;

C.    The costs of this suit, including reasonable attorneys' fees, as provided by law; and

D.    Such further and additional relief as the Court deems just and proper.

## XI.    JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  December 23, 2025                Respectfully submitted,


                                         /s/ Matthew T. Oliverio
                                         Matthew T. Oliverio, Esquire (#3372)
                                         OLIVERIO & MARCACCIO LLP
                                         41 Romano Vineyard Way, Suite 6140
                                         North Kingstown, RI 02852
                                         Telephone: (401) 861-2900
                                         Facsimile: (401) 861-2922
                                         Email: mto@om-rilaw.com

                                         Barry L. Refsin (*pro hac vice* forthcoming)
                                         Eric L. Bloom (*pro hac vice* forthcoming)
                                         Alexander J. Egerváry (*pro hac vice* forthcoming)
                                         Caitlin V. McHugh (*pro hac vice* forthcoming)
                                         Cary Zhang (*pro hac vice* forthcoming)
                                         HANGLEY ARONCHICK SEGAL PUDLIN &SCHILLER
                                         One Logan Square, 27th Floor
                                         Philadelphia, PA 19103
                                         Telephone: (215) 568-6200
                                         Email: brefsin@hangley.com
                                         Email: ebloom@hangley.com
                                         Email: aegervary@hangley.com
                                         Email: cmchugh@hangley.com
                                         Email: czhang@hangley.com